Per Curiam:
Plaintiff is a retired Colonel in the Army of the United States who was released from active duty on January 31, 1955, not by reason of physical disability, and placed on the retired list of the Army of the United States, by reason of age and satisfactory military service, with entitlement to retirement pay from February 1, 1955, under the provisions of sections 301 and 302 of the Army and Air Force Vitalization and Eetirement Equalization Act of 1948, 62 Stat. 1081, 1087. Plaintiff now seeks to recover the disability retirement pay of a Colonel, commencing February 1, 1955, and continuing thereafter, based on the provisions of Title IV of the Career Compensation Act of 1949, 63 Stat. 802,816. Plaintiff alleges that at the time of his release from active duty he had numerous disabilities which rendered him unfit to perform military duties, and that as a result thereof, he is entitled to recover disability retirement pay.
Plaintiff bases his suit on the alleged arbitrary and capricious action of the Department of the Army.
Having failed to show that the action of the Department of the Army in denying plaintiff disability retirement is arbitrary or capricious, plaintiff’s petition will be dismissed.
It is so ordered.
EINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff served in the New York National Guard from 1914 to 1917, and performed active duty on the Mexican Border with the Federalized New York National Guard from June 1916 to January 1917. He served in the United States Army as a private from September 4,1918, to December 20, 1918, when he was appointed a second lieutenant in the Field Artillery Reserve.
2. Plaintiff served on active duty with the Counterintelligence Corps of the Army from January 5,1942, to January *174 31,1955, when he was released from active duty not by reason of physical disability. He was placed on the Retired List of the Army of the United States in the grade of colonel, with entitlement to retirement pay from February 1, 1955, under the provisions of sections 301 and 302 of the Army and Air Force Vitalization and Retirement Equalization Act of 1948, 62 Stat. 1081, having been found, upon application, to be eligible for such benefits by reason of age and satisfactory military service. He has been credited with 39 years, 4 months, and 26 days of satisfactory Federal service, of which 14 years, 2 months, and 18 days were active Federal service.
3. On December 31, 1941, plaintiff was given a physical examination and found physically qualified for extended active duty. In 1946 plaintiff underwent a cholecystectomy (removal of the gall bladder) at Fort Jay Army Hospital. Electrocardiographs taken as a part of the plaintiff’s annual physical examinations in 1946, 1947, and 1949 were interpreted as disclosing left axis deviation or shift, otherwise within normal limits.
4. Plaintiff was admitted to Walter Reed Army Hospital on August 31, 1951. On September 6, 1951, a retropubic prostatectomy was performed, and he was returned to duty on January 16, 1952. On June 4, 1952, plaintiff was again admitted to Walter Reed Army Hospital where he underwent two operations secondary to the prostatectomy performed on September 6, 1951. On December 9, 1952, a Medical Board recommended that plaintiff be returned to temporary limited duty, any desk duty commensurate with his age and grade, for 3 months, with revaluation at the end of that period.
5. A Medical Board, convened at Walter Reed Army Hospital on May 5,1953, recommended that plaintiff be returned to general military service commensurate with his age and grade. The Board noted that, since his discharge from the hospital on December 9,1952, plaintiff had been performing what amounted to full duty commensurate with his age and grade, and that he had had no difficulty in doing so.
6. Plaintiff was examined on October 7, 1953, at which time reference was made to three abdominal scars, and, under item 32 of the examination report, the following statement *175 was made: “bulging of extra rectal mass felt R. rectum tip of examining finger.” Under summary of defects and diagnoses the following statement was recorded: “Recurrent sinus tract & abscess formation following prostatic surgery.” The examination report was checked under item 77 as qualified for GS (general service), and the electrocardiogram was within normal limits. Further examinations were ordered and plaintiff underwent a fourth operation in 48 months, for removal of a large cyst on the right kidney on December 10, 1953. The operating surgeon, Colonel Van Buskird, stated that the cyst was undoubtedly formed because of infection from the prior three operations.
7. On July 19, 1954, plaintiff advised the Adjutant General that he would be 60 years of age on October 26,1954, and requested application forms for “Retirement Benefits under Title III PL 810-80th Congress * * *.”
8. Plaintiff was given a so-called retirement physical examination at the Pentagon Army Dispensary August 17, 1954. He stated that he believed he was unfit for duty. He requested hospitalization and that he be permitted to appear before a Physical Evaluation Board. An electrocardiogram taken August 17,1954, was within normal limits and showed no abnormalities. On August 30,1954, an electrocardiogram disclosed nonspecific T wave changes. This was described by Dr. Mattingly as a nonspecific type of abnormality and by Dr. Goodman as an “abnormal T wave.” A later electrocardiogram, dated September 3, 1954, consisting of both a normal resting electrocardiogram and a postexercise electrocardiogram, or Master Test, showed an ST depression of approximately half a millimeter, which has been interpreted to indicate a mild degree of coronary insufficiency.
9. Plaintiff was transferred to Walter Reed Army Hospital for evaluation for possible Physical Evaluation Board action. A Medical Board, convened at Walter Reed on December 17, 1954, found plaintiff to have the following diagnosis:
1. Hypertensive vascular disease, benign, mild, labile; unchanged. LOD [Line of Duty] : Yes.
2. Arteriosclerotic heart disease; manifested by coronary insufficiency, mild; premature ventricular contractions, occasional, asymptomatic; normal sinus *176 rhythm; functional capacity Class I-B. Unchanged. LOD: Yes.
3. Degenerative joint disease (osteo-arthritis), multiple, involving lumbosacral spine, moderate, mildly symptomatic; not incapacitating; unchanged. LOD: Yes.
4. Arthritis, due to direct trauma, left elbow joint, inild, secondary to old fracture incurred in 1926; unchanged. LOD: No, EPTS[Existed Prior to Service].
5. Deafness, perceptive type, bilateral, mild; cause undetermined. Hearing: AS: 8 db loss; AD: 7 db loss. Speech reception score: AS: 10 db; AD: 8 db. Adjusted speech reception score: AS: 10; AD: 12. Unchanged. LOD: Yes.
6. Cystitis, chronic, moderate, with increased frequency and nocturia with occasional pyuria, cause undetermined ; unchanged. LOD: Yes.
The Board determined degree of disability for military service as “none”; type of service recommended “general”; qualified for overseas “yes”; disability stated briefly in nontechnical language “none”; and recommended that plaintiff be returned to military duty commensurate with his age and grade with lowered profile of P-3, L-2, and H-3.
The Clinical Abstract attached to the Board Proceedings stated as follows:
Previous Personal History. — This patient was a 60-year-old Lieutenant Colonel with 13% years’ active duty. He served in Germany from 1947 to 1951. He did not smoke, had a rare alcoholic beverage, and occasionally took aspirin at night because of back pain. His father died at age 58 of coronary occlusion. His mother died at age 55 of carcinoma of the breast. He had one brother, aged 56, who was ill of unknown cause and there were two other siblings, living and well. The patient had the usual childhood diseases without sequelae. He had symptoms of a peptic ulcer many years ago without recurrence. He had a suprapubic prostatectomy in September 1951. He had subsequent surgery because of complications in 1952. He had excision of a right renal pelvic cyst in December 1953. He had an appendectomy in 1926 and a cholecystectomy in 1946. He sustained a fracture of his left arm in 1926 and was kicked in the chest by a horse in 1922.
History of present Illness. — This 60-year-old white male was admitted to this hospital on 1 November 1954 for evaluation prior to separation from the service. His *177 most recent history centered about his urological condition which started in 1949 in Germany. At that time he first developed aching low back pain associated with urinary hesitancy and dribbling. Initially a diagnosis of carcinoma of the prostate was made but was later decided to be benign prostatic hypertrophy. No definitive therapy was done. When the patient returned to the Zone of the Interior with the same symptoms, he was evaluated at Walter Reed Army Hospital in September 1951. A suprapubic prostatectomy was performed following which there were several post-operative complications. The patient remained here until February 1952. After his discharge from the hospital the patient continued to have low back pain as well as frequency although his other GU symptoms had cleared. He noted at that time a lemon-sized firm lump forming at the base of his incision. In the spring of 1952 this area was incised and drained of purulent material and in July 1952 a fistulous tract was dissected out from the same area. A third operation was performed because of the fistula in September 1952. He stated, however, that his symptom of low back pain continued but was relieved by taking one to two aspirins at bed time in order to get a good night’s sleep. He was again seen by the GU Service in December 1953 after a retrograde urogram and retroperitoneal air study revealed a right renal mass. At surgery a pelvic cyst on the right was found and was excised. Since that time he complained of low back pain which was associated with activity, prolonged standing, riding or sitting. There was also associated stiffness which was most marked in the early morning. Approximately one year ago he was told that his blood pressure was elevated but had never had any active therapy. He had noted also over the past 12 to 18 months that his tolerance to exercise had decreased. He cannot walk up inclines, hills or steps without becoming dyspneic. He had had to give up hunting and golf because of these symptoms. He had, on occasion, noted ill-defined chest pain which was not related to effort. This was described as a burning sensation in the anterior chest at the apex of his heart. He had never taken nitroglycerin. There was no history of ankle edema or nocturnal dyspnea. During August 1954 he had a rather marked amount of chest pain and was seen at the Pentagon Dispensary at which time an electrocardiogram was done which showed nonspecific T wave changes over the lateral precordium but was interpreted as being a normal tracing. A stress test was done on *178 8 September at the Pentagon and was interpreted to be within normal limits. The patient was evaluated at the Out-Patient Service of this hospital and, because of the multiplicity of the complaints, it was deemed necessary that he be admitted to the hospital.
Physical Examination. — Height 5'7"; weight, 182; temperature 98.6; pulse, 68 and regular; blood pressure, 160/90, supine. He was a well developed and well nourished elderly white male who appeared to be in no acute distress. He was alert and cooperative. Examination of the head, eyes, ears, nose and throat revealed bilateral arcus senilis and minimal arteriosclerotic fundal changes, Grade I. The external auditory canals showed small exostoses just proximal to the drums. His nasal septum was deviated to the left. The chest was clear to auscultation and percussion. The heart was not enlarged. Rhythm was regular. There were no murmurs heard. The abdominal examination showed four well healed scars, giving evidence of previous gallbladder, suprapubic appendectomy, and right flank surgery. The scars were well healed and showed no evidence of hernias. There was no palpable organs or masses present. Examination of the extremities showed no edema, no cyanosis or clubbing, and no evidence of arterial or venous insufficiency. Examination of the back showed no localized area of bony tenderness. There was a tendency to flattening of the lumbar curve and over the general area of Ll-4 there was tenderness to fist percussion. There was no particular limitation of motion of the back. The patient could flex to within six inches of the floor. The neurological examination was not remarkable. The remainder of the physical examination was within normal limits.
Laboratory Findings. — White blood count on admission was normal with a normal differential; hemoglobin, 16 gm.; corrected sedimentation rate, 32; BUN,. 12 mg. per cent; fasting glucose, 90 mg. percent. Urinalyses showed a slight trace of albumin, negative microscopic examination, no sugar, and specific gravities from 1.016 to 1.022. Concentration tests showed specific gravities of 1.022,1.022 and 1.024. PSP excretion test showed 47 per cent dye excretion in the first 30 minutes with a total excretion of 80 per cent. Lipoproteins: Sf 12-20,45 mg. per cent; Sf 20-100,58 mg. per cent. Chest plate showed the lung fields to be clear. The heart was normal in size, shape and position. There was slight elongation of the thoracic aorta but no evidence of pathological change in the diaphragm, pleura, or bony thorax was noted. X-ray *179 of the left elbow showed irregularity of the olecranon process of the ulna, including irregularity of the posterior portion of the articulating surface of the ulna. These findings were compatible with old trauma. Examination of the thoracic spine showed evidence of moderate hypertrophic osteo-arthritic changes. There was a slight tendency toward bridging. Examination of the lumbar spine including spot films of the lumbosacral junction disclosed narrowing of the L5-S1 interspace. The vertebral bodies were intact. The articular surfaces were smooth. The remaining joint spaces were well preserved. Electrocardiogram on 10 November, when compared to the tracings of August 1954, showed the T wave in lead I slightly more abnormal, manifesting an initial negativity. Correspondingly the T wave in lead III was somewhat higher in voltage. The T wave in aVL, previously flat, was slightly inverted; the T waves, Y4 through V6, were diphasic whereas previously they were low and upright. This tracing was interpreted to be consistent with left ventricular abnormality but was nonspecific. A stress test done on 22 November was not interpreted as being positive. Repeat tracing on 6 December was interpreted to be within normal limits as compared with previous electrocardiograms during the present hospitalization. The minor T wave abnormalities that were previously described were no longer present. There were no serial changes to suggest evolution of an intramural infarction and while they suggest in some extent ischemic changes of hypertensive cardiovascular disease, other evidence of left ventricular hypertrophy was not evident. The present S-l — R-5 ratio was at the upper limits of normal but was not a clear one of left ventricular hypertrophy and other changes of left ventricular hypertrophy were not present. Vital capacity was 4.5 liters.
Consultations. — On 23 November the patient was seen in the Audiology Clinic where the diagnosis of deafness, perceptive type, bilateral, mild, was made. It was the opinion that according to present physical standards this officer met requirements for general military duty from a hearing standpoint and no aural rehabilitation was indicated. On 5 November he was seen by the consultant in orthopedics who agreed with the diagnosis of osteo-arthritis of the spine. He was fitted with a lumbo-sacral support to be used for long automobile trips or prolonged physical activity. He was advised to use a firm bed and to take aspirin as necessary for his discomfort. It was felt that he was not disabled because *180 of the arthritis of the spine. On 26 November she [sic] was seen by the consultant in physical medicine who felt that the degree of osteo-arthritis which this patient had was not sufficiently severe to prevent duty. It was felt that no treatment was indicated at that time. On 20 November 1954 the patient was seen in consultation by the Chief of the Cardiology Service who made the diagnoses of hypertensive vascular disease, mild, labile; and ar-teriosclerotic heart disease, manifested by coronary insufficiency, mild; with normal sinus rhythm; premature ventricular contractions, occasional, asymptomatic; functional capacity Class I-B. The consultation was as follows: “Comments and Recommendations: Although this officer has evidence of some cardiovascular abnormalities as listed above, I do not consider him incapacitated for military duty commensurate with his age and grade. The mild hypertension was first noted during the period in which he was being treated for genito-urinary conditions and might have been related to those conditions which have now been corrected. There is no evidence of renal impairment, cardiac hypertrophy, cerebral, or other complications from the mild, labile hypertension. During the summer of 1954 a routine ECGr revealed minor T wave abnormalities, nonspecific in character, which led to an investigation and evaluation of his cardiovascular status. It was at this point that he elicited first symptom of chest pain and such symptom has never been truly characteristic of angina but conceivably might represent an atypical manifestation. These minor electrocardiographic abnormalities have not been persistent and today his ECGr is within normal limits. He had a double two-step exercise test at the Pentagon in September 1954 which was interpreted as being negative, but on review of this tracing, there is S-T depression which, in light of our experience, would indicate coronary insufficiency. A repeat stress test in this hospital on 6 November 1954 again showed S-T depression in Leads II and V-4 of approximately .5 mm. which again is a borderline finding. During the period of hospitalization his symptoms and findings have not clearly indicated a clinical picture of overt coronary disease with angina and there has been nothing to indicate an old infarction on review of ECG’s, 201 file and hospital records from 1946 to the present date. The recent T wave changes in Leads I, aVL and V-5 and V-6 while possibly representing ischemia in the lateral wall of the left ventricle were not of a character that would suggest an intramural infarction at that time. While *181 there are potentialities in this patient of development of further vascular disease with increasing ills, in evaluating him at this time there is insufficient evidence to consider him disabled because of a cardiovascular condition. Pertinent Physical Findings: Active, ambulatory. Blood pressure (18 Nov) 170/90. There is no evidence of peripheral edema or peripheral arterial disease. There is no hepatomegaly or pulmonary congestion. The pulse is slow and regular with an occasional premature contraction which by an ECG has been shown to be premature ventricular contractions. The retinal arterioles show Grade I hypertensive changes but otherwise normal. There are no significant abnormalities in the heart sounds and no murmurs are present. There is no enlargement of the heart by clinical examination, by x-ray, or by fluoroscopy. The thoracic aorta shows increased density and early tortuosity but no undue widening. Review of recent hospitalization record and previous records prior to hospitalization show that the hypertension is variable and at times the blood pressures are within normal limits. Renal function studies show no significant disturbance in renal function. A review of ECG’s in his medical 201 file, previous records in this clinic and from the Pentagon Dispensary, show normal ECG’s at all times except for tire presence of minor T wave abnormalities, nonspecific in character, in a period from September to November 1954. The present ECG (6 December 1954) is within normal limits. Stress test in this hospital on 22 November shows S-T depression in the postexercise ECG but such was not in excess of .5 mm. and not considered as being definite evidence of coronary insufficiency.” On 7 December he was seen in consultation by the GU Clinic where it was recommended that this patient have a cystogram, a cystometrogram, and cystoscopy to completely evaluate his lower GÜ tract for bladder capacity and residual tags. Therefore, on 10 December a cystogram was performed which showed the bladder to be normal in outline but smaller than normal. There was no residual in the after voiding film. The cystometrogram showed a normal curve with normal emptying stimulus. Cystoscopy showed evidence of chronic urethritis with moderate obstruction near the apex of the gland. It was the diagnostic impression that he had cystitis, chronic, moderate, with increased frequency and nocturia with occasional pyuria; however, it was the impression that these findings were not incapacitating insofar as duty was concerned.
*182 Oourse in the Hospital. — The patient’s entire hospitalization was taken up with evaluation of his physical status. He was ambulatory and asymptomatic except for periodic low back pain which was relieved by sali-cylates and rest. It is the opinion of the Chief of General Medicine Service #1 that this man did exhibit evidence of mild arteriosclerotic heart disease, osteo-arthritis, multiple, of the spine, and residual chronic cystitis; however, it is felt that these findings do not warrant appearance before a Physical Evaluation Board and that this patient is fit for military duty commensurate with his age and grade with a lowered profile of P-3, L-2, and H-3, having received maximum benefits of hospitalization.
10. The Medical Profile Notification as to plaintiff’s profile serial of P3, Ul, L2, H3, El, SI, stated therein that “This man should not be assigned duties that require more than ordinary activity. He should refrain from prolonged strenuous activity and that which is fatiguing. This would include prolonged and irregular duty hours, physical training, march and drill. He should refrain from heavy lifting or carrying heavy objects.”
11. The Medical Board proceedings of December 17,1954, were submitted to the Surgeon General by the Adjutant General with a statement that the officer was being separated by reason of age. The referred memorandum was stamped “Off. of Surg. Gen., Wash., D.C., Dec. 27,1954, Physically Qualified.” The Medical Board had, on December 17, 1954, recommended “that Lieutenant Colonel Louis C. Salz 0-139369 be returned to military duty commensurate with his age and grade with a lowered profile of P-3 L-2 and H-3.” He was ordered to the Walter Eeed Army Hospital Personnel Section to secure his new assignment. On January 31, 1955, plaintiff was relieved from active duty not due to physical disability and placed on the retired list of the Army of the United States in the grade of colonel, with entitlement to retirement pay on December 31, 1955, under the provisions of sections 301 and 302 of the Army and Air Force Vitalization and Eetirement Equalization Act of 1948, 62 Stat. 1081, 10 U.S.C. 1331.
12. Under date of December 20, 1954, plaintiff advised the Adjutant General that he had made a formal complaint *183 to the Inspector General’s Office of the Surgeon General’s Office that the Medical Board did not function properly and failed to comply with Army [Regulations. By letter dated J anuary 13,1955, plaintiff wrote the President of the United States requesting assistance in having his case brought before an Army Physical Evaluation Board.
13. By letter dated January 17, 1955, the Assistant Inspector General, Office of The Surgeon General, advised the plaintiff as follows:
A complete study and evaluation of your complaint has been made and for the sate of clarity and your information, the major points within your complaint will be discussed in this letter.
a. In regard to the references made in your allegations that you were not given a “full and fair hearing” by the medical board at Walter Beed Army Hospital within the meaning of paragraph 3b, AB 600-450, it is desired to point out that the regulation that you quote is not applicable as the title of this regulation is “Separation for Physical Disability.” You were not separated for physical disability. In fact, separation was not involved and you were returned to duty by Walter Beed Army Hospital.
b. Your complaint stated that Lt. Colonel Thalmann, Captains Green and Sapp had not complied with AB 40-80 or AB 40-590 or with existing Uniform Code of Military Justice as it pertains to boards. It is desired to point out that medical boards are mentioned in two paragraphs of AB 40-680, paragraphs 3c and 10. Paragraph 3c establishes the medical board as an instrumentality of the Army Medical Service to assist a hospital commander. Paragraph 10 of the same regulation defines the functions, when employed, evaluation factors and recordings of medical board findings. AB 40-590 has been rescinded at least two years. However, medical boards are defined in paragraph 11 of AB 40-610 which outlines the composition of a medical board, that is, “The Commanding Officer will appoint a medical board composed of three or more medical officers to advise him on the disposition of patients in such cases as he deems necessary or as required by higher authority.” The rank or component requirements are not stated or required. Your statement that this board was not in accordance with the Uniform Code of Military Justice is not applicable, as a medical board is an instrumentality of the Army Medical Service to obtain a professional decision *184 on a problematical disposition. It is not a disciplinary and/or adjudicating board. The patient’s rights under law are not involved, consequently, not concerned.
c. The refusal of personnel at Walter Need Army Hospital to allow you access to a book that the Veterans Administration uses as a guide for percentage disabilities was proper. This book by directive is used by the Physical Evaluation Board in rating patients with a physical disability who appear before it. This rating book plays no part in medical board proceedings.
d. A review of your medical board proceedings dated 17 December 1954, reveals that the board did take final action. The exact recommendation was “Lt. Colonel, Louis C. Salz, 0-139369, be returned to military duty commensurate with his age and grade with lowered profile P-3, L-2, and H-3.” For your information, SR 600-450-1 has been rescinded and AR 40-680 applies.
e. There is no provision made for a patient to study his medical reports, as a medical board is a professional board convened to assist the hospital commander in problematical dispositions. Again, it is noted that it is not a disciplinary and/or adjudicating body. I should like to reiterate that a medical board is a consensus of medical opinion for a problematical disposition. Due to the very terminology involved in a medical board proceeding, very little would be gained by a lay patient actively entering into professional deliberation.
In view of the above, your allegations have not been substantiated; however, if there is any further information that you desire to submit to the undersigned, the case will be reopened.
14. The Surgeon General, by letter dated January 25,1955, wrote plaintiff as follows:
Your letter to the President of the United States, dated 13 January 1955, has been referred to this office for a reply.
In the interim period since writing to the President, you have undoubtedly received a reply to your complaint of 20 December 1954, that was made to Lieutenant Colonel Anthony J. Zolenas, Jr., Assistant Inspector General, Office of The Surgeon General.
It is noted in your letter to the President that the following statement is made, “. . . . that the above mentioned Medical Board has violated existing Army Regulations which I have now ascertained to be paragraph 10b, AR 40-680, dated 18 February 1954, and *185 under the circumstances, they had no authority to act in my case.”
Paragraph 10b, AR 40-680 reads as follows:
“10. Medical Boards.
“b. When employed. — Patients should not be routinely considered by a medical board prior to disposition. Generally, only those cases which present aspects of a problematical or controversial nature, and those cases on which medical board action is required by higher authority should be evaluated by a medical board prior to disposition. Patients who are to be returned to duty without any revision in their recorded medical fitness for duty, those who require transfer to another military hospital prior to final disposition, and those who clearly require physical evaluation board action because of a permanent disability which is noncontroversial in natu/re Mould not be considered by a medical board to such disposition. This does not preclude, however, the use of such boards to assist in determining the appropriate action to be taken in problematical cases. Except in cases of self-destruction, a determination of mental incompetence will be made only by the approved findings of a medical board.” (Underscoring added).
It is presumed that your claim to lack of authority of the medical board to act in your case is based upon the above underscored portion of paragraph 10b, AR 40-680. This provision appears in the regulation for the purpose of utilizing the attending medical officer recommendations for a direct referral of noncontroversial cases to the physical evaluation board. When this method is used, the same forms are prepared but only one medical officer signs the proceedings. When paragraph 8d, AR 40-680, is read in conjunction with paragraph 10b, AR 40-680, it is clear that the direct referral to the physical evaluation board is only utilized in noncontroversial cases. For your convenience, paragraph 8d, AR 40-680 reads as follows:
“8. Attending Medical Officer.
“d. Referral of cases direct to a physical evaluation board. — The decision of whether a case should be referred direct to a physical evaluation board without the intermediate action of a medical board rests with the hospital commander. In general, only noncontroversial cases which clearly indicate permanent medical unfitness and on which an accurate evaluation is considered feasible will be referred directly to a physical evaluation board without medical board action. Cases in which the prob *186 able disposition, permanence of disability, or stability of condition cannot be reasonably determined will be evaluated by a medical board.”
A review of your complaint of 20 December 1954, and the subsequent investigation by Lieutenant Colonel A. J. Zolenas, Jr., Assistant Inspector General, OTSG, and the Medical Board Proceedings, conducted at Walter Reed Army Hospital on 17 December 1954, have substantiated the recommendations of the Medical Board as approved by the Executive Officer at Walter Heed Army Hospital that “Lieutenant Colonel Louis C. Salz, 0139369, be returned to military duty commensurate with his age and grade, with lowered profile of P-3, L-2 and H-3.”
The Judge Advocate General, in an opinion of 4 May 1951 (JAGA 1951/2444) stated, in effect, that there is no legal requirement for a hearing before a physical evaluation board in the case of an individual who had been found by a medical board to be physically fit.
I trust that this will furnish you with the information you desire.
15. Plaintiff executed a claim for compensation on January 31,1955, while at the Walter Reed Army Hospital, which claim was filed with the Veterans Administration on June 7, 1955. The claim was allowed and his service-connected disabilities rated as follows:

Percent

705-122 7101 Hypertensive Vascular and Arteriosclerotic Heart Disease- 30
5003 Osteoarthritis, Degenerative, Multiple- 20
Cystitis, Prostatectomy- 20
Arthritis, Traumatic, left Elbow. Aggravated- 110
Deafness, Perceptive Type, Mild- 0
Cholecystectomy_ 0
Combined Rating from February 1, 1955- 60
1 Disregarding the diagnosis of traumatic arthritis, which had its origin prior to military service, the combined rating of 30 percent, 20 percent, and 20 percent is 60 percent under the applicable Rating Schedule.
By letter dated July 14,1955, plaintiff elected to continue to receive Army retired pay in lieu of compensation from the Veterans Administration, and, as a result, was not paid compensation by the Veterans Administration. After Public Law 376, 85th Cong., 2d Sess., was enacted (72 Stat. 86), amending section 1005 of the Veterans Benefits Act of 1947 (71 Stat. 123), plaintiff could, and did waive part of his *187 retirement pay in order to accept Veterans Administration compensation. Subsequently plaintiff’s rating was increased to 70 percent, effective January 1, 1960. He now receives $156 per month from the Veterans Administration and $206 per month retired pay.
16. In an application dated August 22, 1955, filed with the Army Board for Correction of Military Records, plaintiff requested a correction of his records and stated therein that his separation for retirement purposes “not by reason of physical disability” was incorrect. Plaintiff advised the Board that he did not desire to appear before the Board and that he did not desire to have witnesses appear in person in support of his application.
17. Plaintiff’s application was referred to the Surgeon General’s Office with a request for comment and opinion as to whether plaintiff’s physical condition on January 31, 1955, was such as to warrant his retirement by reason of physical disability. In reply thereto, the Surgeon General’s Office advised-the Board as follows.
1. The records, including the Veterans Administration file, in the case of Louis C. Salz, 0-139369, have been carefully reviewed.
2. The records reveal that at the time that this officer was separated from the service he had several disabilities rateable under the Veterans Administration Schedule. These disabilities, however, were not of such nature or degree as to have precluded his performance of duty.
3. Based upon the evidence of record, the opinion is expressed that at the time that this officer was separated from the service he did not have any physical disability of such nature or degree as would have warranted his retirement because of physical disability under the laws, rules, regulations or policies then in effect.
18. By letter dated February 9,1956, plaintiff was advised by the Adjutant General as follows:
I have been requested by the Army Board for Correction of Military Records to make further reply to your request for correction of your Army records.
The administrative procedures established by the Secretary of the Army for guidance of the Army Board for Correction of Military Records provide that the Board *188 may deny an application where a sufficient basis for a review has not been established.
Following examination and consideration of your Army records together with such facts as have been presented by you, the Army Board for Correction of Military Becords on 25 January 1956, determined that insufficient evidence has been presented to indicate probable material error or injustice. Accordingly, your application was denied.
You are privileged at any time to submit to the Board for consideration new and material evidence not previously considered.
19. AB40-105, dated January 9,1952, “Standards of Physical Examination for Commission or Warrant in Begular Army, National Guard of the United States, Army of the United States, and Organized Beserve Corps,” provided, in part, as follows:
Section II
Physical Peofile Seeial
6. General, a. The physical profile serial is a system for indicating, in a simple and graphic manner, the total functional ability of an individual to perform military duties and not the sum of the various anatomical defects that the individual may happen to exhibit. Since the analysis of an individual’s physical and mental status plays an important role in his military assignment and future welfare, clear and accurate descriptions of his physical and mental conditions are essential, and the functional grading must be executed with great care.
b. In the physical profile serial system, the human functions are considered under six factors and each factor is designated by a letter of the alphabet. These six letters are in order “PULHES.” The significance of the respective letters in the system is as follows:
(1) “P” Physique. — This factor concerns general physical capacity or stamina and takes into account such considerations as age, build, strength, endurance, height, weight, agility, energy, and muscular coordination. Also considered under this factor are organic defects and diseases which would affect general physical capacity, and all organic defects or diseases that do not fall under other factors of this system.
*189 (2) “U” Upper extremities. — This factor concerns the functional use of the hands, arms, shoulder girdle, and spine (cervical, thoracic, and upper lumbar) in regard to strength, range of motion, and general efficiency.
(3) “L” Lower extremities. — This factor concerns the functional use of the feet, legs, pelvic girdle, lower back musculature, and lower spine (lower lumbar and sacral) in regard to strength, range of motion, and general efficiency.
(4) “H” Searing and ear defects. — This factor concerns auditory acuity and diseases and defects of the ear.
(5) “E” Eyes. — This factor concerns visual acuity and diseases and defects of the eye.
(6) “S” NeuropsycMatric. — This factor concerns personality, emotional stability, and psychiatric and neurological diseases and defects, including history thereof.
c. Each of the factors represented by the letters “PULHES” is considered separately and is given a separate grade. Under each letter, the individual es graded on a numerical scale from one to four according to his functional ability in that factor. Number 1 represents above average efficiency with a minimal physical defect or no physical defect at all; number 2 represents average efficiency with a mild nonprogressive physical defect; number 3 represents below average efficiency with a moderate physical defect (borderline); number 4 represents nonacceptable efficiency with a marked physical defect. For example, an individual with 20/20 vision would receive the grade of 1 under the letter “E”. An individual with active tuberculosis would receive a grade of 4 under letter “P”, etc.
d. In certain instances, more specific information will be rendered by adding a code letter as a suffix to the profile serial. These code letters are—
(1) “K”. — Indicates a defect which is remediable by corrective treatment and which does not prevent the utilization of the individual for military duty. Correction of the defect would improve the general health and welfare of the individual although he is acceptable even with the defect present. Correction of the defect may or may not result in a change of the individual’s profile,
*190 (2) “T”. — Indicates a defect which is temporary in nature and which, though it might be disqualifying if it persisted, could be so corrected by treatment that the individual would be physically qualified. In this instance, correction of the defect would change the individual’s profile.
(3) “D”. — Indicates a defect which, under SR 600-175-1, is permanently disqualifying for oversea service.
e. When the physical profile has been completed, a sequence of six numbers or number-letter combinations will be obtained. To facilitate assignment of individuals after they have been given a profile, a code known as the “physical category” has been adopted to identify various types of profiles. The letters “A”, “B”, “C”, and “E” are used to represent certain combinations of numbers in the profile. The code is as follows:
(1) “A” — a profile serial of 111111.
(2) “B” — a profile in which 2 is the lowest number in the profile (e.g., 222121).
(3) “C” — a profile in which 3 is the lowest number in the profile (e.g., 213211).
(4) “E” — a profile in which 4 is the lowest number in the profile (e.g., 411214).
_ f. An individual with an “A” or a “B” type category (i.e., any profile serial in which all numbers are 1 or 2) is considered acceptable for military service, except that personnel of the Women’s Army Corps require to have numeral “1” under the “S” factor. An individual with a “C” type category is considered acceptable for military service, but, because of his (her) physical defect, may require some assignment consideration within his (her) unit (command function). An “E” type category (i.e., any profile serial containing the number 4) is considered nonacceptable.
20. SRr-40-120-1, dated October 9,1953, “Medical Service, Medical Standards of Fitness and Unfitness for Retention on Active Duty,” provided, in part, as follows:
5. Application of medical standards. — These medical standards of fitness and unfitness apply to all military personnel of the Army. An individual who is otherwise scheduled for retirement or separation is not automatically found unfit if it is determined that he has a rateable disability. Such an individual is found to be *191 unfit only when it is determined that bis disability is of sucb a nature that if he were not retired or separated, he could not perform the duties commensurate with his age, grade, branch, and normal duties. * * *.
8. Defective hearing. — Deafness does not alter a patient’s medical fitness for retention on active duty when the patient’s hearing can be sufficiently improved through rehabilitation and use of a hearing aid to meet the medical fitness standards prescribed for retention on active duty. No Army member will be considered physically unfit for retention on active duty solely because of hearing defect, provided such defect can be improved by use of hearing aid to a loss of 20 decibels or less in speech reception score. * * *.
33. Angina pectoris. — Angina pectoris when present in a mild degree is not considered to render an individual unfit.
36. Hypertension and hypertensive cardiovascular disease.— * * *.
5. In general, individuals with early or mild hypertension should not be found unfit. * * * .
37. Arteriosclerosis. — Arteriosclerosis, per se, even though severe, is rarely considered to render an individual unfit.
54. Cystitis. — Cystitis is usually not considered to render an individual unfit. In some cases when the condition is chronic and severe and has not responded to a prolonged period of treatment the individual may be considered unfit.
65. Arthritis. — a. Arthritis, if relatively _ asymptomatic, is usually not considered to render an individual unfit. * * *.
21. Daniel H. Goodman, M.D., a Phoenix, Arizona, specialist in internal medicine, having been so certified by the American Board of Internal Medicine, testified on behalf of plaintiff. He examined plaintiff on August 9,1956, with particular reference to the cardiovascular system, no attempt having been made to go into other systems. Dr. Goodman testified that although plaintiff did not appear acutely ill, it was his impression that plaintiff had the following:
1. Hypertension, arterial, essential, of moderate severity, cause undetermined.
2. Arteriosclerosis, generalized, moderate severity, including (a) coronary sclerosis; (b) arteriosclerosis ob-literans of a mild degree involving the arteries of both lower extremities.
*192 3. Coronary artery disease, moderate severity: (a) coronary sclerosis and insufficiency; (b) anginal syndrome, that is, angina pectoris; (c) strain of the left ventricle.
Dr. Goodman, on direct examination, was asked to briefly summarize, in lay terms, his diagnosis of plaintiff’s heart condition. In response thereto, he testified that “It is my feeling that this patient did have hypertensive vascular disease and angina pectoris.” Dr. Goodman was further of the feeling that plaintiff never had a coronary occlusion or a clot within his heai*t. Although, at the time of his examination of the plaintiff, Dr. Goodman did take one electrocardiogram, he did not see any of plaintiff’s earlier electrocardiograms. Dr. Goodman further testified that the only history he had in the case was the history as related to him by the plaintiff; and that he now realizes that the fact that he did not take an X-ray picture of plaintiff’s chest and heart was a rather serious omission.
22,. Dr. Thomas W. Mattingly testified as a witness for defendant. He served on active duty in the Army Medical Corps from 1934 to 1958. He has been certified as a specialist in cardiovascular diseases by the American Board of Internal Medicine and is generally recognized as an eminent cardiologist. His Army practice was devoted almost exclusively to cardiovascular diseases, and at the time of his retirement from the Army in 1958 he was serving as Chief of the Department of Medicine and Cardiology at Walter Heed Army Hospital. Dr. Mattingly is currently Director of Medical Education, and senior attending in Internal Medicine at the Washington (D.C.) Hospital Center; a consultant to various hospitals, including Walter Reed Army Hospital and Children’s Hospital; and a Clinical Professor of Medicine at Georgetown University School of Medicine. He has written numerous medical articles and textbooks on the subject of cardiovascular diseases.
Dr. Mattingly was Chief of the Department of Medicine and Cardiology at Walter Reed Army Hospital during the time that plaintiff was in that hospital for evaluation prior to his separation from the service. He examined the plain *193 tiff in November and December 1954, and did not consider plaintiff incapacitated for military duty commensurate with his age and grade at that time.
Dr. Mattingly testified during the trial of this case, in pertinent part, as follows:
* * * Colonel Salz had stressed the fact that we did not spend — I did not spend a long time telling him all about his problems, because this examination was for the purpose of this Board and not for his care.
Now, the summary of diagnoses of a cardiovascular nature, which was found at that time, was as follows— and I will give each diagnosis, in as clear lay terms as I can, the significance of these diagnoses.
The first diagnosis is hypertensive vascular disease, mild labile. Now, what we mean by hypertensive vascular disease is this: A person who has a mild elevation of his blood pressure, which may be above that of normal today and may be back to normal at intervals, and not persistently at a level, above which we consider abnormal. We have noted earlier his blood pressure is recorded from 122 over 80 — or 70, I don’t remember which — to the highest I have seen anywhere, that of 180 over 70.
With a condition such as this occurring in a person for the first time, as is noted both in the records and by history some time in his late 50’s, is usually the result of sclerosis in his large vessels, such as his aorta loses its elasticity. This is what we call a mechanical type of hypertension, rather than severe hypertension, which begins in the 40’s which, as a rule, leads to cardiac enlargement, cardiac failure, and a lot of disability. This mild hypertension occurring at this age usually stays in the same degree of severity and doesn’t tend to become quickly aggravated. So much for diagnosis number 1.
The next diagnosis was that of arteriosclerotic heart disease, manifested by coronary insufficiency, mild. Now the basis for this diagnosis is this: that the presence of some sclerosis in his aorta, not particularly more than you would find in anyone of the age of 60, which gives us a good idea of the ecological factor. But in addition to this, the Colonel had demonstrated, on two occasions on stress test, changes with slight S-T depression, but of a character that we have found to be associated with coronary insufficiency. This, however, was of a mild *194 degree. This is an objective finding and, therefore, from my standpoint and from our experience in studying large groups of Army officers, of more value than trying to place all our emphasis on symptoms of chest pain.
In evaluating the pain or discomfort in the chest that ■the Colonel had described in his previous histories, and as that was listed at that time, while they could conceivably represent a typical angina, they were not characteristic of angina and more like that maybe associated with some neuromuscular skeletal condition such as arthritis of the spine, which he very definitely has shown. This is quite common in people beyond the age of 50, and it occurs in people who have heart disease and it occurs by itself. So we have a long time ago got away from trying to make a diagnosis of coronary disease solely on the presence of some sort of chest pain.
*****
To go on further, to describe the features which made me consider this arterioschlerotic [sic] heart disease to be mild and to be nondisabling were these: In all of the electrocardiograms from 1946, as have been previously referred to as exhibits, up to this last electrocardiogram with stress test done at time of examination, there had never been any persistent changes in the electrocardiogram or any serial changes, that means occurring in repeated sessions, successive electrocardiograms that would indicate that he had an actual coronary occlusion or myocardium infarction. These are the complications that occur with arteriosclerotic heart disease with coronary insufficiency that usually cause disability.
*****
Likewise, there is no evidence of cardiac enlargement, by x-ray. There was no evidence of congestive failure. The blood supply to the extremities was good, and other than this symptomatic story of these vague pains of a cutting character or continuous pains, all night, through the chest or arms, which had clear-cut angina, there was nothing that would indicate that the mild degree of arteriosclerotic heart disease, up to the date of examination, 20 November 1954, had disabled the patient. Other diagnoses made here are just factors that — not factors — features that tell us more about the nature of the heart disease.
For example, the diagnosis made of normal sinus rhythm with occasional premature ventricular contrac *195 tions, those have been noted in the electrocardiograms in the past.
Our last diagnosis of functional capacity IB, this is just a classification following that of the New York Heart Association and later the American Heart Association classification, which is used for the purpose of describing certain combinations of heart diseases and their anatomical and functional status. And normally, an individual with functional capacity IB, such as was considered at this time, is not considered physically unfit for duty and, therefore, this was considered the appropriate classification for his cardiac found at that time. I see no particular reason for going into the detailed findings, unless there is some further question. *****
Now, as Colonel Salz has stated, when these examinations were done, he had been around the hospital or he had been relatively inactive, therefore, his disease may appear minimum at that time, and that to some extent is true. But in that state of inactivity and rest, his blood pressure was 138 over 84, entirely within normal limits.
Now with the stress test, which was taken for the purpose of checking his electrocardiogram after exercise, it has been my routine for years to take blood pressures immediately after this period of exercise. In other words, this gave us an idea of what happens to an individual’s blood pressure when he does exercise or does have stress, and his blood pressure after this period of exercise, which consists of going over the 34 steps, which is equivalent to climbing a flight of steps 34 flights high, went up to a maximum of 170 over 86, which is only a mild elevation. And at the end of 10 minutes, it was back to 132 over 80. So this is in essence one demonstration of how his blood pressure reacts under exercise and how quickly, with what little elevation he does have, it returns to normal. If I may add also that examination of blood vessels in his eye showed what we would class as Grade 1 hypertensive changes, which are those that occurred with mild hypertension.
23. Counsel for defendant has proposed a finding which includes the following statement:
The Army does not as a matter of course consider the collective impact of a number of subdisabling conditions *196 and automatically determine degrees of disability by arithmetical methods as does the Veterans Administration under its disability compensation program. [Emphasis supplied.]
The emphasized portion of the proposed finding is incorrect and contrary to fact. Any condition rateable at zero percent, or less than 10 percent, is a noncompensable or “sub-disabling” condition. A veteran may have many diagnosed conditions each of which is rated at zero percent or less than 10 percent, but the Veterans Administration, in evaluating service connected conditions, cannot and does not arrive at a compensable rating under these circumstances by adding or combining a group of noncompensable conditions. On the other hand, all ratings of 10 percent or more must be combined in order to arrive at the appropriate rating. This provision for arriving at a combined rating is specifically included in the Rating Schedule authorized for use by all agencies of the Department of Defense.
24. The Medical Profiling Officer recommended under date of December 17, 1954, that plaintiff be not assigned duties that require more than ordinary activity; that he should refrain from long, strenuous activity and that which is fatiguing, which would include prolonged and irregular duty hours, physical training, marching and drilling; and that he should refrain from heavy lifting or carrying of heavy objects. The same officer, after listing the various conditions from which plaintiff was suffering at that time, stated that the conditions were permanent.
25. Based upon the complete record, it is found that the action of the Department of the Army was not arbitrary or capricious or grossly erroneous and is supported by substantial evidence.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and the petition is, therefore, dismissed.