Durfee, Judge,
delivered the opinion of the court:
This is an action to recover disability retirement pay. "Plaintiff served from 1928 to 1930 as an officer of the Regular Navy, and then in the Naval Reserve until August 30, 1939. He was again appointed to the Naval Reserve in 1942 -and served thereafter on extended active duty until March 29, 1946, when he was released to inactive duty as physically fit. Plaintiff now seeks retirement pay from that date on -the ground that he was at that time physically unfit to perform his duties and commission in the Naval service and .should have then been retired for service-connected -disability.
Following several attacks of malaria in 1943 at Guadalcanal during World War II and subsequent periods of hospitalization and treatment, plaintiff appears to have had residual symptoms. After an annual physical examination -on January 19, 1944, a Board of three Navy doctors found that plaintiff was “not physically qualified to perform all his duties at sea” and that he was “physically qualified for shore duty only.”
Three months later, on April 22, 1944, another Board of three Navy doctors found that plaintiff" was “fit to perform ¿active sea or foreign service” and “physically qualified for temporary promotion to Lt. Comdr.” One year later, in . April, 1945, he was operated on for hernia in a Navy hospital ¡and was discharged on May 21, 1945, as fit for duty. No significant defects other than hernia were noted.
Two months later a Navy examination on June 15, 1945, : noted “Facial tremors” and a “Generalized Abnormal EEG.” (Electroencephalogram). Ten days later on June .25,1945, plaintiff again entered a Navy hospital for á month’s period. Part of the admitting diagnosis was corrected from “No Disease (Headache) #2143” to “Asthenia Postinfective,” a general physical condition of disability. During this month’s period of hospitalization plaintiff underwent many physical examinations, consultations and tests. Sev *95 eral smear tests for malaria were recorded as “No parasites, found.” However the final diagnostic report concluded:
7~17-15: Neurological Consultation: Examination fails; to'reveal any'neurological findings that might shed any light upon the bases of his complaints. The feeling is that his EEGr abnormality antedated both the taking-of the experimental drug and his malaria, and probably is not related to either. Th[ese] complaints are not unlike those following minor head injury, ie. so called “post concussion syndrome”. If it were known whether the complaint is of organic origin we would have some-bases for deciding whether this patient’s symptoms are* psychogenic or organic. The Rorschach is not at all conclusive in this case. Regardless of any organic intra-cranial lesion he may have. He manifests .a definitely neurotic reaction and attitude, both of which merit tense-psychiatric attention.
Thereafter plaintiff was transferred to a Navy hospital in-Asheville, North Carolina, for further treatment and convalescence from July 1945, to January 1946. He received no particular treatment, other than rest. In October a Board of Medical Survey found that he was unfit for duty and recommended further treatment. In November the Board' of Medical Survey found that he was physically able to perform full duty, to which he was released on January 1,1946..
On January 1, plaintiff was found physically fit to perform active duty at sea or on foreign service and for temporary promotion to commander. On January 2, 1946, he-was examined by a Board of Medical Examiners for separation, if qualified, from service. The Board’s report noted the history of malaria from 1943 to 1945; found no symptoms off postinfective asthenia remaining and reported that plaintiff" was physically qualified for active duty. Plaintiff was there upon released from active duty incident to demobilization on March 29,1946. He then engaged in civilian employment until this was terminated for health reasons in October 1946. Thereupon, he applied for disability compensation with the-Veterans Administration for malarial attacks, hernia, headaches, nausea and recurrent anemia, lack of energy, etc., as-shown by Naval records. Upon examination by a neuro-psychiatrist of the Veterans Administration, head tremors-; *96 were noted under stress of questioning, no malaria or mental disorder was found, and a final diagnosis of “anxiety neurosis” was entered. On June 10, 1947, he was awarded ten percent disability compensation for “nervous condition following recurrent malaria.” On February 8,1948, he received another similar examination, with no substantial changes from the previous report except an abnormal amount of slow activity during hyperventilation, due possibly to “sequella of the previous encephalopathy” (which as we have previously noted, had been found connected with his cerebral malaria). It was recommended that the patient should remain under medical supervision.
Over a year later, plaintiff requested that Ids payments for disability be discontinued because Ms condition had not become aggravated, and he was able to earn a livelihood.
Subsequent to Ms release from active duty on March 29, 1946, plaintiff served on active duty for about two weeks officers’ training during 1949, 1961, 1952, 1955, and 1956. Plaintiff was found to be physically fit to perform the duties of Ms rank at the beginning of each period, and was found to be physically qualified for release from active duty at the end of each period. In his Officers Fitness Report dated September 20, 1949, plaintiff indicated that he was physically fit for sea duty.
From the time of Ms release from active duty in 1946, plaintiff continued in active private employment and practice of law for ten years until September 1957. In May of that year, he applied again to the Veterans Administration for disability compensation because of impairment of the central nervous system, resulting from wartime cerebral malaria, principally manifest by steadily worsening tremors (as previously noted in his naval records). Upon a neuro-psychiatric examination by the Veterans Administration which reviewed his previous medical record, Ms condition was diagnosed as “Anxiety Reaction, moderately severe to severe, associated with depressive features and tremors of the head and hand.” He was accordingly granted service-connected disability compensation at ten percent from March 30, 1946, to October 2, 1957, and rerated at fifty percent beginning October 3, 1957. The medical examiner reported *97 ;that he could not state that there was a relationship between the existing tremors of the head and those reported on plaintiff’s naval record in 1945 because “the records are not too complete.” On February 1, 1960, plaintiff was rated by the Veterans Administration at 60% disability for Parkinsonism and 30% for anxiety reaction.
Prior to January 7, 1958, plaintiff filed an application for correction of his military records to show that he had been separated from the service by reason of physical disability and had been placed on the disability retired list. Plaintiff filed affidavits by two highly qualified doctors who reported a complete physical and neurological examination of plaintiff by them in 1957. Both expressed the opinion that plaintiff’s medical history in the Navy established that he had acute encephalitis and postencephalitic phenomena which rendered him unfit for duty when he was released from active naval service. These two doctors further stated that this condition resulted in an existing disability that might eventually cause permanent and complete invalidism. The .sequelae or resultant symptoms noted were asthenia and extra-pyramidal disease — Parkinsonian type.
Thereafter, the Correction Board requested the opinion of the Chief of the Navy Bureau of Medicine and Surgery, .and invited particular attention to plaintiff’s medical statements as above summarized, together with the Board’s file, plaintiff’s medical and officer files and fitness reports. The Assistant Chief of the Bureau responded for the Chief in a brief and rather cursory written review of the record, with ,an opinion which concluded that there was “no evidence of record to suggest that Cdr. Merson’s physical condition, at the time of his release from active duty or subsequent thereto for several years, was anythmg but fully qualified.” [Emphasis supplied.]
This court has held that the Correction Board may not rely solely upon medical advisory opinions or recommendations from the Surgeon General’s office when none of the persons who made the recommendation had ever seen or examined the applicant. Weiner v. United States, 148 Ct. Cl. 445, at 454 (1960); Hutter v. United States, 170 Ct. Cl. 517, 345 F. 2d, 828 (1965).
*98 However, the court has repeatedly held that Correction. Boards may seek and consider the comments of the medical authorities of the United States in considering the entire record. Uhley v. United States, 137 Ct. Cl. 275; 147 F. Supp. 497 (1957); Towell v. United States, 150 Ct. Cl. 422, (1960); Hoen v. United States, 157 Ct. Cl. 235 (1962); Nichols v. United States, 158 Ct. Cl. 412 (1962); Patten v. United States, 161 Ct. Cl. 131 (1963); Salz v. United States, 157 Ct. Cl. 172 (1962).
In the present case, the notice to plaintiff of the Board’s refusal to act, dated July 30, 1959, stated that, “your detailed brief was reviewed by the Board together with all other documentary evidence of record,” in concluding that plaintiff had failed to establish a sufficient basis for further action. Accordingly, we cannot find that the Board abdicated its duties and functions in receiving or considering the two memorandum reports from the Bureau, in view of the Board secretary’s statement that it reviewed the entire record in reaching its conclusion.
Upon receipt of this first advisory opinion from the Bureau of Medicine and Surgery, the Correction Board promptly requested comments and further evidence from plaintiff, whose counsel then filed an extensive medical and legal brief and additional medical affidavits as to plaintiff’s condition before, during and after release from World War II duty. The Correction Board thereupon again asked the Chief, Bureau of Medicine and Surgery for comment and recommendation on the basis of the record and plaintiff’s brief. The Chief responded through the Director of the Professional Division of the Bureau. He concluded that although plaintiff was then incapacitated by “an extra-pyramidal disease, secondary to an acute encephalitis incurred in 1943; hence a service-incurred physical disability,” he was fully qualified physically to perform all of the duties of his rank at the time he was released from active duty and for some time thereafter, and accordingly not entitled to disability retirement or severance pay.
In a letter dated July 30, 1959, the Board’s assistant secretary advised plaintiff of the refusal by the Board to act on his application and the denial of his request (the second) *99 for formal hearing. Plaintiff had previously filed an extensive brief with additional medical and lay affidavits to establish that he was unfit for duty when released from service in order to support his request for relief and formal hearing. The Board’s letter of July 30, 1959, to plaintiff stated that, “a hearing by the Board may .be denied when a petitioner has failed to show that an entry or omission in his naval record was improper or unjust under-then existing standards of naval law, administration and practice.” The Board’s letter concluded, “It is not the intention of the Board to imply that a subsequent review of your case may not be had. As stated above, however, the burden is on you to show that an error or injustice has occurred. In the absence of additional material evidence, no further action on your application is contemplated.”
Plaintiff thereupon on August 11, 1959, requested a copy of the proceedings, stating “we of course cannot attempt to get any new or material evidence unless we know, exactly what was said by the Bureau.” (of Medicine and Surgery).
To this request the Board replied on August 14, 1959, in part, as follows:
Reference is made to your letter of 11 August 1959 relative to the case of Commander Martin Merson.
In accordance with your request, there- is enclosed herewith a copy of a letter dated 6 July 1959 from Chief, Bureau of Medicine and Surgery.
You are informed that there are no proceedings in the case since the Board, by unanimous vote, denied the -request for a- hearing. In arriving at this decision, the Board considered not only the aforementioned letter; but also., all other evidence of record including the extensive brief filed on 8 June 1959 by you in Commander Merson’s behalf.
The denial of the application without a .hearing was based upon a consideration or review of the entire record, as required by the regulation. The Board might have been well advised under the particular facts in this case to grant a hearing as twice requested by plaintiff. Whether he was fit for service when released would appear to be a complicated and difficult question of medical evidence and opinion that should have been gone into thoroughly by .the-Correction *100 Board and a hearing for plaintiff would have been helpful. Plaintiff has never had any hearing of any kind before any Retiring Board, any Correction Board, or any other kind of a board.
However, the Board is not required to grant a hearing under the Correction Board statute, 10 U.S.C. § 1552 (1958 ed.), or the Navy regulation, which provides:
Review of application. Each application and the available military or naval records * * * will be reviewed to determine whether to authorize a hearing or to deny the application without a hearing. * * * 32 C.F.R. 723.3(e).
We have reviewed plaintiff’s medical records in detail. Certainly, it is clear, as the Bureau of Medicine and Surgery stated in its second advisory opinion of July 6, 1959 that plaintiff was then “incapacitated by the progressively destructive processes of an extra-pyramidal disease, secondary to an acute encephalitis incurred in 1943; hence a service-incurred physical disability.”
However, as the Bureau of Medicine and Surgery correctly stated in its second advisory opinion to the Correction Board, “The crucial factor in making a determination as to which laws are applicable is found in the determination of physical fitness for duty at the time of release from active duty.” [Emphasis supplied.]
While the finding of the Veterans Administration, about a year after plaintiff’s release from active duty, of 10% service-connected disability for “Nervous condition following recurrent malaria” is entitled to consideration, it alone is not enough to establish that plaintiff was not fit for duty when released on March 29, 1946. This is particularly true in view of the fact that plaintiff, about a year after his compensation award, requested that his disability payments be discontinued because his condition had not become aggravated and he was able to earn a livelihood.
Following the termination of his employment with the Electric Boat Company for health reasons about nine months after his release from service in March 1946, plaintiff was employed for five years as head of the legal department of the Dixie Cup Company and became active in civic affairs. *101 During 1953-1954 he was employed by the State Department in Washington and later as vice president of Temple University. During this ten-year period of continuous active and successful employment, with no record of any recurrence of malarial or other disease symptoms, plaintiff also served on active duty for training for six two-week periods from 1949 to 1956. He was found to be physically fit to perform. the duties of his rank at the beginning of each period of active duty for training, and to be physically qualified for release from active duty at the end of each period. In his Officers Fitness Report for the 1949 training period, plaintiff indicated that he was physically qualified for sea duty and his performance was appraised by the reporting officer as follows:
Cdr Merson’s thorough knowledge of the law and practical experience was a great help to this office while on his two weeks’ active duty. He has a pleasing personality. He is energetic and diligent in his work. He possesses good common sense and judgment. He has no mental foibles. Cdr Merson has a healthy attitude toward the Naval service. He is recommended for promotion.
Taken as a whole the record thus far would certainly support a finding that plaintiff was physically fit for active duty when he was released from active duty on March 29, 1946. However, plaintiff submitted an extensive brief to the Correction Board in which he reviewed the facts pertinent to his application for correction of military records, together with a medical disquisition of medical literature pertinent to malaria and its symptomatology. He also submitted an affidavit by his brother as to his physical condition before, during and after release from active duty after World War II, together with an affidavit by a fellow officer who stated that in 1943 plaintiff was “a strong, wiry type of man who worked countless hours at his job,” but that in 1950 the affiant observed a marked change in plaintiff’s appearance and physical condition, with continued shaking of head and hands as though he had palsy.
Plaintiff also cited the Synopsis of Opinions of the Judge Advocate General of the Navy of November 25,1958, relating to physical disability retirement and separation under Title *102 10 U.S.C., Chapter 61, wherein it was stated in pertinent part ras follows:
The general standard of fitness must be applied, in the case of an officer of the line, to all of the duties or billets in which such officer might normally, in the course of assignment over a period of time, find himself serving.
With respect to disability proceedings, the standard long applied in the naval service is whether the individual is or is not physically capable of performing ALL the duties of his rank, grade, or rating to a degree that would reasonably fulfill the purposes of his employment. (Emphasis supplied.)
In addition, plaintiff submitted medical affidavits by two physicians of the highest professional qualifications and .standing, made on the basis of plaintiff’s medical records and an examination of plaintiff in July 1957, over eleven years after his release from active duty. These medical .'Statements concluded that plaintiff was not fit for duty when released from, active service because of encephalitis acute, with post encephalitic phenomena, the sequalae of which have produced increasing symptoms of “an extra-pyramidal syndrome,” a “Parkinsonian picture,” and that these defects were permanent and progressive enough to eventually cause permanent and complete invalidism.
These two same physicians and another of equally high qualifications testified at the trial herein to the same effect as above stated.
Two highly qualified Navy physicians testified at .the trial herein that based upon their review of plaintiff’s medical record prior to his -release from active duty, plaintiff was physically qualified for. full duty at the time' of his release in 1946.
In reviewing this medical testiinony, pro and con, we consider the following statement :by Dr. Feldman in-his affidavit for the plaintiff to-be particularly appropriate:
It is unfortunately many years since the acute episode so that diagnostic observations are of somewhat limited value in establishing an exact-etiology,
We find ourselves much in the same position recently stated by this court in a similar case, Boland v. United States, 169 Ct. Cl. 145, 150 (1965):
*103 Treating the evidence as a whole, we cannot say who was right or wrong. * * *
Since all this evidence was before the Correction Board, we think there was substantial evidence to support the findings of the Board [that Boland was not incapacitated at the time of his release from duty]. * * *
In Williams v. United States, 130 Ct. Cl. 435, 441, 127 F. Supp. 617, 619, cert. denied, 349 U.S. 938 (1955), this court in considering the weight of opposing evidence said:
The fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole.
We cannot conclude that the plaintiff’s evidence in this case based largely on diagnostic observations and medical examinations made eleven years after plaintiff’s release, and conceded to be of “somewhat limited value in establishing an exact etiology,” is so substantial in character as to detract from the great weight of the evidence supporting the Board’s decision so as to render this evidence less than substantial on the record as a whole.
We therefore accept the finding of the trial commissioner that the plaintiff has not met his burden of proving as arbitrary or not supported by substantial evidence the action of the Board for Correction of Naval Records in its review of the plaintiff’s case. Accordingly, plaintiff is not entitled to recover. The petition is dismissed.
findings of fact
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, an officer of the Naval Reserve, who served on active duty during World War II, sues for retirement pay from March 29,1946, the day he was released (as physically fit for duty) to inactive duty. A careful study of the record in this case leaves the impression that from early 1943, until his release to inactive duty, most of the plaintiff’s time was spent in, or en route to or from, naval hospitals.
*104 2. The plaintiff, who was born August 21,1906, graduated from the United States Naval Academy in June 1928, and thereafter served as an officer of the Regular Navy until September 10,1930, when he resigned from the Regular Navy. At that time, he accepted a commission in the Naval Reserve, which he held from October 21, 1930, until August 30, 1939.
In the meantime, the plaintiff attended Harvard Law School, from Which he graduated in 1933. He was again appointed to the Naval Reserve on May 25, 1942, with the rank of lieutenant. He served on extended active duty from May 29, 1942, until March 29, 1946, when he was released to inactive duty with the rank of commander.
3. The plaintiff’s resignation from the Navy in 1930 was tendered to enable him to attend law school and was unrelated to his health, which was excellent at that time.
4. On January 4, 1943, plaintiff reported to the Advanced Naval Base (Lunga), Guadalcanal, British Solomon Islands. He was assigned to duty as the executive officer at Lunga Naval Base.
5. On January 27, 1943, plaintiff was hospitalized at the U.S. Naval Base, Lunga, Guadalcanal, with the first of five successive attacks of malaria. In this regard, pertinent naval medical records contain the following entries:
(a) Naval Base, Lunga
A 1-27-43 Diag. Fever, Cause Undetermined, #1309
Not Due to Own Misconduct
CC: Fever, chills, backache, headache, and general malaise.
PI: Patient has a temperature of 102.6
This is the first attack he had had.
* * * ❖ %
(b) Naval Base, Lunga
RA 3-3-43 Diag. Fever, Cause Undetermined, #1309.
Not Due to Own Misconduct.
CC: Fever, chills, backache, headache and general malaise.
PI: Patient has a temperature of 101.4-. This is the second attack he has had.
*105 (c) Naval Base, Lunga
A 4-1-43 Diagnosis: Malaria Benign Tertian, #1004.
Not Due to His Own Misconbuct-
CC: Fever, Chills, Backache, Headache, and general malaise.
PE: Patient has temperature of 1031 This is [described as] the 1st attack he has had.
LAB: Blood smear positive for Plasmodium Vivax.
* * * * *
(d) Naval Base, Lunga
RA 5-3-43 Diagnosis: Malaria Malignant Ter-tian, #1004.
Not Due to His Own Misconbuct. CC: Fever, Chills, Backache, Headache, and general malaise.
* * * * *
LAB: Blood smear positive for Plas-modium Falciparum.
* * *
Remarks: Transfer to base hospital destination unknown, NOT to be returned to this area.
T 5-6-43 Should not be returned to malarial area.
U.S.^ Naval Base Hospital #3. IEspiritu Santo, New Hebrides]
RA 5-6-43 Diagnosis: Malaria, Malignant Teetian
Numbee: 1004
* * * *
5-7-43 Transferred this date to U.S.S. Tryon for further treatment and disposition.
U.S.S. Teton
RA 5-7-43 Diagnosis: Malaria, Malignant Tertian #1004.
5-12-43 Transferred this date to M.O.B. #4 for further observation and treatment.
*106 U.S. Naval Mobile Hospital No. Four [Auckland, New Zealand]
5-12-43 Diagnosis: Malaria, Malignant Tertian.
Diagnosis #1004. * * *
Not due to own misconduct.
C.C. Fever, chills, nausea and vomiting.
P.I. Patient has been stationed on Guadalcanal since about 1-4-43. Has had four attacks of malaria since latter part of January 1943, with treatment each time with quinine. (No atabrine or plasmochin). Present attack began 5-3-43 with typical chills, fever, generalized aches and vomiting. * * *
P.E. Undernourished white male, age 37, who is apparently acutely ill, and quite weak. His skin is essentially normal.
^ * * * *
5-13-43 [Report of Medical Survey]
Diagnosis Malaria, Malignant Tertian, #1004. * * *
Disability is not the result of his own misconduct and was incurred in line of duty.
ip * * * *
Present condition unfit jor duty. Probable future duration indefinite. (Emphasis supplied.)
Recommendation That he be transferred to the nearest naval hospital in the United States for further treatment and disposition.
Facts Are as Follows: * * * On May 5, * * * There was persistent nausea and vomiting and [sic] this attack, and the patient became quite markedly dehydrated. * * * and the only symptoms consisted of nausea, anorexia, weakness and the loss of 25 lbs in weight. Examination revealed a poorly nourished individual obviously exhausted and moderately pale. * * * The patient’s general *107 condition is such that he will require a prolonged period of convalescence. It is therefore recommended that he be transferred to the U.S. for further treatment and disposition. He should not be assigned to further duty in a malarial country in the future.
[The above report was approved by the Bureau of Medicine and Surgery on May 27, 1943.]
*****
U.S. Naval Hospital, San Diego, Calif.
RA 5-30-43 Diagnosis: Malaria, Malignant Tertian, No. 1004.
*****
T 7-86-48 Transferred to United States Naval Hospital, Albany [sic], New York * * *
(e) U.S. Naval Hospital St. Albans, L.I., N.Y.
BA 7-26-43 Diagnosis: Malaria, Malignant Tertian #1004
*****
Progress: * * * On 8-26-43 patient had a severe chill, nausea, vomiting, headache, backache and general malaise. Temp. 102° and obvious manifestation of a malarial relapse. Blood smear positive for plasmodium vivax. * * * On 8-30-43 he was asymptomatic and feeling very well. Since this episode he has had repeatedly negative smears. At the present time he is considered well enough to return to duty provided that such duty be outside of malarial territory. (Emphasis supplied.)
*****
6. It thus appears that within about 3 weeks of his arrival at Guadalcanal, plaintiff was stricken with malaria. The attacks recurred monthly until he was removed from Guadal *108 canal to the U.S. Naval Base Hospital #3, Espiritu Santo, New Hebrides; to the U.S.S. Tryon; to U.S. Naval Mobile Hospital No. Four, Auckland, New Zealand; and from there to the mainland, landing at San Diego. Plaintiff was transferred to the U.S. Naval Hospital, San Diego, California, on May 30, 1943, where he remained until July 26, 1943. While at the naval hospital in San Diego, plaintiff was given a 30-day-leave period beginning June 15th. Upon his return from leave, plaintiff was transferred to the U.S. Naval Hospital, St. Albans, Long Island, New York.
7. On November 1, 1943, the plaintiff was examined by a Board of Medical Survey, composed of three Navy doctors, at the U.S. Naval Hospital, St. Albans, Long Island, New York. The Board’s report of medical survey showed that the plaintiff had been admitted to the above-named hospital on July 26, 1943, with a diagnosis of malaria, maligNANT tertian #1004; that his disability was not the result of his own misconduct and that it had been incurred in line of duty; that his condition was “unfit for sea duty” with probable future duration “indefinite.” The Board recommended that the plaintiff be assigned to shore duty for 6 months, preferably within the Third Naval District, and that insofar as possible, “he be not assigned to duty in a malarial district in the future.”
The Bureau of Medicine and Surgery of the Navy Department, Washington, D.C., forwarded the report of the Medical Survey Board to the Bureau of Naval Personnel with the Board’s recommendation modified rather than approved, with the further comment:
He is considered fit for duty at this time, but it is recommended that he be detailed to shore duty in a temperate climate for a period of at least six (6) months.
The facts, which were found by the Board and upon which the Board’s recommendation had been based, are as follows:
Facts Are as Follows : This 37 year old Lt. USNE, with 1 year 7 months service during the present emergency was admitted to this hospital on 7-26-43 from the U.S.N.H. San Diego, Calif, with the diagnosis malaria malignant TERTIAN #1004. He had been on duty in the southwest Pacific area and was stationed at ÜSN Base Lunga since 1-4-43. On 1-27-43 he began to have *109 fever, chills, headaches, backache and general malaise. Blood smears were negative for plasmodin, and a diagnosis of Fever, Cause Undetermined #1309 was made. He was discharged to duty 5 days later. On 3-3-43 the same manifestation recurred and blood smear was again negative, and again the 'same diagnosis was made. Three days later he was discharged to duty. On 4-1-43 he had a third attack of malaria, with chills and fever, and his blood smear was positive for plasmodium vivas. A diagnosis of Malaria, Malignant Tertian #1004 was established and specific treatment with quinine and ata-brine was instituted. On 5-5-43 he had another attack. Blood smear was positive for Plasmodium Falciparum. With this attack there was persistent nausea and vomiting and the patient became markedly dehydrated. There was no improvement in his condition and he was transferred to the USN Base Hospital No. 3 on 5-6-43 and on the following day was transferred to a ship for transportation to the USN Mobile Hospital No. 4. At the time of admission to that hospital his condition was poor. Has temp, was normal but he was cachectic and had lost 25 lbs. in weight. His chief complaints were weakness, anorexia and nausea. The spleen was palpable below the costal margin but was not tender. Blood smears were negative for malaria. He was in need of prolonged convalescence and was returned to the U.S. for further treatment. On 5-15-43 he was transferred to the U.S.N.H. San Diego where he was given convalescent care and transferred, to the U.S.N.H. St. Albans, L.I., N.Y. on 7-26-43. On admission to this hospital his condition was good and he was asymptomatic. His laboratory findings were completely negative. He remained free from symptoms until 8-26-43 rat which time he had a chill, temperature of 102° and nausea and vomiting. Blood smear was positive for plasmodium vivax. Quinine therapy was instituted and all symptoms promptly subsided. He was given the required course of quinine therapy and has progressed satisfactorily. Since 8-30-43 all blood smears have been negative for plasmodia. Blood count and hemoglobin are normal; urine negative. He has been entirely asymptomatic since 8-30-43.
8. On November 26, 1943, the plaintiff was discharged from the U.S. Naval Hospital, St. Albans, Long Island, and was detailed to duty with the Bureau of Naval Personnel in Washington.
*110 9. On December 10,1943,14 days following Ms return to duty, the plaintiff reported to the U.S. Naval Dispensary, Arlington Annex, Washington D.C., at approximately 1000 hours with a “very severe chill.” It was noted on the records that plaintiff was having a very severe chill; that he was unable to hold a thermometer in Ms mouth; that his skin was hot and dry; and that a blood smear was positive for “Malaria, Malignant, Tertian.” It was also stated that “In view of the number of recurrences and severity, hospitalization is advised for intensive course of treatment.” Accordingly, plaintiff was transferred on that date to the U.S. Naval Hospital, National Naval Medical Center, Bethesda, Maryland, for treatment.
10. From December 10,1943, to December 20,1943, plaintiff was hospitalized at the U.S. Naval Hospital, Bethesda, Maryland. On December 13,1943, the admitting diagnosis of “Malaria, Malignant Tertian #1004” was changed to “Malaria, Benign Tertian #1004.” Laboratory reports taken during this period showed that on December 10, 1943, malaria smears were positive for malaria parasites, i.e., plasmodium vivax. The same finding was reported on December 11, 1943. On December 20, 1943, there was entered in his medical history at the U.S. Naval Hospital, Bethesda, Maryland, the following:
12-20-43 This officer was admitted to this hospital 12-10-43 with his sixth attack of vivax malaria. The only laboratory studies of note were the positive blood smear for malaria, and the presence of a mild secondary anemia. He was given a week’s course of Atabrine with an uneventful convalescence.
12-20-43 Discharged to duty this date. Well.
11. As a result of an annual physical examination, completed on January 19,1944, by a Board of three Navy doctors (two physicians and one dentist), the plaintiff was found to be “not physically qualified to perform all Ms duties at sea”; however, he was found to be “physically qualified for limited shore duty only.”
12. On April 22, 1944, plaintiff was given a physical examination to determine his physical qualifications for temporary promotion to lieutenant commander. He was found *111 to be “fit to perform active duty at sea or on foreign service.” He was also found to be “physically qualified for temporary promotion to Lt. Comdr. DE-V(S), TTSNR.” It is noted that this examination was likewise performed by a Board of three Navy doctors. Dr. B. H. Holler, the senior medical officer at the U.S. Naval Dispensary, Arlington Annex, Navy Department, was a member of this Board as well as a member of the Board referred to in finding 11.
13. In March 1945 the plaintiff applied to the Equitable Life Assurance Society of the United States for a life insurance policy. He submitted to a physical examination by that company’s medical examiner, who found that the plaintiff had a left inguinal hernia. No other details of this examination are in evidence, nor is it known whether the plaintiff was or was not found physically qualified for the issuance of the $5,000 ordinary life policy which he requested.
14. Plaintiff was admitted to the U.S. Naval Hospital, Bethesda, Maryland, on April 17, 1945, with a diagnosis of “Hernia, Inguinal, Indirect #2003.” The physical examination at the time of admission revealed no significant defects other than hernia. Plaintiff underwent an operation for repair of the hernia on April 20,1945. He was discharged to duty on May 21, 1945, having been found “fit for same.”
15. On June 15, 1945, plaintiff was given an eye examination at the U.S. Naval Dispensary, U.S. Navy Department, Washington, D.C. On the same date, a request was made for an electroencephalogram report on plaintiff. The requested report, dated June 16, 1945, noted “Facial tremors” and stated the impression of Lt. Robert Cohn, Medical Corps, United States Navy, to be that the electroencephalogram was a “GENERALIZED ABNORMAL EEG.” [1]
16. On June 25, 1945, the plaintiff was admitted to the U.S. Naval Hospital, Bethesda, Maryland, where he remained until July 27,1945. His admitting diagnosis was “No Disease (Headache) #2143.” However, by July 13th, this diagnosis was changed to “Asthenia Postinfective,” and the reason for the change was indicated thereon as “error” in the earlier diagnosis. During the period of this hospitalization, *112 the plaintiff underwent many physical examinations and clinical tests, and was the subject of several consultations, the results of which were recorded as follows:
P.E.: Blood pressure 145/90. Eyegrounds negative except for tortuous arterioles, pupils OK. No lymphadenpathy. E.E.N.T. — negative. Lungs — clear[.] Heart and abdomen are negative.
6-26-45: Patient continues to complain of frontal headache requiring codeine and aspirin for relief._ Lumbar puncture performed. Spinal fluid clear. Initial pressure 110 mm. water. Prompt rise to 150 mm. following compression of left jugular[.] Similar findings on right.
6-26-46: C.B.C. is normal.
6-26-46: Blood sedimentation: 7 mm. per hour.
6-26-46: Stool: O. and P. Helminths and Protozoa are negative. Occult blood: Positive (4 plus).
6-26-46: Smears for malaria: No malarial parasites found.
6-27-46: Spinal Fluid Examination: Kahn, Kolmer and increased globulin are negative.
6-27 46: Spinal Fluid Examination: Eed cell count per cubic mm. 1. White cell count per cubic mm. 1.
6-27-46: Blood Kahn is negative.
6-27-46: Malaria smear: No parasites found.
6-28-46: Urinalysis: K. and M. Albumin and sugar are negative. Occult Blood positive, 3 plus reaction.
6-28-46: Spinal Fluid Chemistry: Glucose 60 Mgs.% Chlorides 730 Mgs.% Proteins 16 Mgs.%
6-29-46: Smear of malaria: No parasites found.
6-30-46: The gastrointestinal disturbance of which the patient is conscious undoubtedly is of functional origin. Possibly the headaches are likewise of similar origin, but tire onset so soon after the administration of a new drug and the electroencephalographic abnormalities cannot be passed over. Will check the latter. Also will get N. P. opinion.
7-2-46: Stool: O. and P. is negative.
7-5-46: Electroencephalogram again shows minor abnormalities but somewhat less than was noted previously. *113 Headaches continue. There is an evident mild anxiety reaction on the part of the patient concerning his physical condition and he states definitely that this antedated the taking of the experimental antimalarial drug. Were it not for the EEG changes, would be inclined to believe that the headaches were psychogenic in origin. (They began on the day he returned to his job, which has been somewhat distasteful to him.) The patient feels that he would be greatly benefitted by convalescent care, and would be inclined to agree if the neurologist feels that no other treatment is necessary and the malariologist feels that no antimalarial therapy should be given now.
7-8-45: Electroencephalogram: Generalized abnormal EEG. (Moderate). No marked change from record of 6-16-45 except that there is less slow activity in the present “spontaneous” run.
7-11-45: Patient is feeling better in that his headaches now are minimal. Had Eorschach test today. To see neurologist for opinion concerning the significance of EEG changes. The prevailing opinion now is that he should be transferred to convalescent hospital in Ash[e]ville for a period of rest.
7-11-45: Eorschach Test: The Eorschach shows extreme reduction in quantity of answers. This to a considerable extent invalidates the evaluation. There were two possibilities from such material as was given. The first is that there is a definite energy upset[.J The record with poor quality of response, tendency to give up and reject cards, ceneremphasis on popular answers and the incompatibility of quality and production with the subjects abstraction ability and level of achievements together with a definite color and shading shock ceneremphasis on wh[o]les seemed reaction time, intraversive experience balance lead to the impression of neurasthenia with a compulsive coloring. In the second aspect of the record there are a number of factors form variability, poor relation of concepts to bl[o]t areas, apparent disphoria, vague confabulatory and even contaminatory trends), all of which suggest some generalized organic brain disturbance.
C& 7-18-45: Diagnosis changed this date by error to EC Asthenia Postinfective #2169. D.N.E.P.T.A. 18 Not misconduct.
7-17-45: Neurological Consultation: Examination fails to reveal any neurological findings that might *114 shed any light upon the bases of his complaints. The feeling is that his EEG abnormality antedated both the taking of the experimental drug and his malaria, and probably is not related to either. Th[ese] complaints are not unlike those following minor head injury, ie. so called “post concussion syndrome”. If it were known whether the complaint is of organic origin we would hare some bases for deciding whether this patient’s symptoms are psychogenic or organic. The Rorschach is not at all conclusive in this case. Regardless of any organic intracranial lesion he may have. He manifests a definitely neurotic reaction and attitude, both of which merit tense psychiatric attention.
7-17-45: Although it seems to be agreed that a good part of this man’s disability probably is psychogenic in origin, the fact that he has had cerebral malaria and has changes in his electroencephalogram cannot be ignored. The patient is anxious to have the opportunity of attempting physical and mental rehabilitation in a convalescent hospital. This would seem to be a logical request. If he returns improved, he can be returned to duty. If he is not improved, psychiatric opinion will be sought. Orders for transfer to IJSNH, Ashe-ville, N.C. requested.
T 14 7-H7-45: Transferred to U.S. Naval Special Hospital, Ash[e]viUe, N.C., for further treatment and convalescence.
(S) R. P. McCombs

Lieut. (MC) USNR.

Approved:
(S) C. L. Andrews

Gomdr. (MC) USN.

By direction.
17. From July 28, 1945, until January 1, 1946, the plaintiff was a patient at U.S. Naval Special Hospital, Asheville, North Carolina. Although he had been sent there from the U.S. Naval Hospital, Bethesda, Maryland, for further treatment and convalescence, the record shows no particular medical treatment, other than rest, and this is confirmed by the testimony of the plaintiff. A summation of his medical history, while at the hospital, appears in the plaintiff’s medical records. It is quoted below:
*115 Medical History
STATE NAME OF PLACE_DATE EACH NEW ENTRY
U.S. Naval Special Hospital,
Asheville, N.C., Date: jul 28 ’45
F T Diagnosis: Asthenia, Post-infective
EPTA No No. 2169 Key Ltr
Is NOT DUE TO HIS OWN MISCONDUCT.
Pt. was sent to this hospital with the purpose of rehabilitating him both mentally and physically. He has improved considerably.
10-15-45: Appeared Beeore Board op Medical Survey this date. The Board is of the opinion that at present he is unfit for duty, and that he should be retained for further treatment.
11-1-45: Physical Examination is essentially negative. Pt. feels well, and is fully capable of assuming duty.
11-16-45: Appeared Bepore Board op Medical Survey this date. The Board is of the opinion that this pt. is now physically able to perform full duty. It is recommended that he be ordered to full duty.
12-17-45: Survey returned from the Bureau of Medicine and Surgery with the recommendation of the Board of Medical Survey approved.
D 157 1-1-46; Discharged this date to duty. Fit for same.
(S) N. P. Shumway
N. P. Shumway,
Lt. Comdr (MC) USNK.
Approved :
(S) S. A. Fuqua
S. A. Fuqua,
Capt. (MC) USNK,

Executive 0 Ulcer.

18. On October 15, 1945, the plaintiff, while a patient at the U.S. Naval Special Hospital, Asheville, North Carolina, appeared before a Board of Medical Survey. The report of medical survey was, upon completion, forwarded to and approved by direction of the Chief, Bureau of Medicine and *116 Surgery, Navy Department, Washington, D.C. That report reads, in part, as follows:
Summary of case history:
This thirty-nine year old Lt. Commander was admitted to the U.S.N.H., Bethesda, Md. on 25 June 1945 under the diagnosis of No Disease (Headache) #214S. His headache had been present for six weeks prior to admission. On May 18,1945, the patient had been given an experimental drug for malaria (which he acquired in Guadalcanal 1942-1943) and after completing two thirds of the dosage he developed a headache which persisted for six weeks. All laboratory tests were negative except E.E.G. which showed moderate abnormal changes which could not be interpreted. The Rorschach test was not considered conclusive in this case. At one time possibility of cerebral malaria had been considered. Diagnosis was changed to Asthenia Postinfective on 7-13-45. Reason Error. Patient was sent here with the purpose of rehabilitating him both mentally and physically. He has improved considerably.
The Board is of the opinion that further treatment is necessary.

Present condition Unfit for duty. Probable future duration indefinite. Recommendation: That this officer be retained for further treatment.
(S) P. G. Richards
P. G. RICHARDS,
Comdr. (MO) ,# USNR, U.S.N.,

Senior Member of Board.

(S) R. M. Dicosola
R. M. Dicosola,
Dr. Comdr. (MO) USNR, U.S.N.,

Member.

(S) N. P. Shumway
N. P. Shumway,
Dr. Comdr. (MC) USNR, U.S.N.,

Member.

19. Details of the physical examination of November 1, 1945, referred to in the quoted material of finding 17, are not *117 in evidence. Since the parties have obviously endeavored to enter into evidence all pertinent medical data concerning the plaintiff’s naval service, it is a fair inference that no record of this examination was made, except that referred to above.
20. On November 16, 1945, the plaintiff again appeared before a Board of Medical Survey while a patient at the U.S. Naval Special Hospital, Asheville, North Carolina. The two senior officers of this Board of Survey were also members of the previous (October 15, 1945) Board (see finding 18). The report which was submitted by the Board to the Chief, Bureau of Medicine and Surgery, Washington, reads, in part, as follows:
Summary of case history:
Reference is made to the previous medical survey submitted on 15 Oct 1945. The recommendation for further treatment was approved.
This patient was admitted to this hospital for the purpose of rehabilitation. Physical examination is essentially negative. Patient feels well, and is fully capable of assuming duty.
The Board is of the opinion that this patient is now physically able of assuming full duty.

. . Present condition Fit for duty. Probable future du-ration_. Becommendation: That he be ordered to full duty.
(S) P. G. Bichards
P. G. Bichards,
Comdr. (MC) USNB,U.S.N.,

Senior Member of Board.

(S) N. P. Shumway
N. P. Shumway,
Lt. Comdr. (MC) USNB, U.'S.N.,

Member.

(S) M. L. Gray
jVf Tj dr'RA'y
Ur. (jg) (MC) USNB, U.S.N.,

Member.

*118 21. On January 1, 1946, plaintiff was given a physical examination for the purposes of determining his fitness for promotion to the rank of commander, USNR. It was reported that plaintiff had been afflicted with “Malaria, Benign Tertian, last episode May 1945. Post Malarial Asthe[n]ia and on sick list until 1-1-46.” Plaintiff was found physically qualified to perform active duty at sea or on foreign service and for temporary promotion to commander on January 1, 1946.
22. The plaintiff was ordered, on January 2, 1946, to the U.S. Naval Personnel Separation Center, Washington, D.C., for separation, if qualified, from the naval service. In this connection, he was examined by a Board of three Navy doctors (two physicians and one dentist). The report of physical examination by the Board of Medical Examiners contains, in pertinent part, the following findings:
History of illness or injury — Cartilage removed from It. knee — 1933. lit. inguinal hernia — 1916. Malaria — 1943. UCD.
* * * * *
Nervous system — neg
Romberg — neg Incoordination (gait, speech) — none
Reflexes, superficial — intact, deep (knee, ankle, elbow) —intact Tremors — none
Serological tests (when required) — kahn Negative
Abnormal psyche (neurasthenia, psychasthenia, depression, instability, worries) — stable—no symptoms of postinfective asthenia remains.
Remarks on abnormalities not otherwise noted or sufficiently described above — May 194[5] last recurrent attack of malaria.
Findings and recommendations (as per Courts and Boards, when necessary) — Physically qualified for release from active duty.
Board of Medical Examiners :
(S) CWS
C. W. Smith,
Capt. (MC) USN (Ret).
(S) H. D. Collett
H. D. Collett,
ComdR. (MC) USNR.
*119 (S) F. Kraft for
P. Miller,
Lt. Comdr. (DC) USNR.
23. Plaintiff was released from active duty, incident to demobilization, on March 29, 1946, following terminal leave.
24. Upon his release from active duty, the plaintiff was employed by the Electric Boat Company, Groton, Connecticut. Since he had been advised by many Navy doctors not to return to a tropical climate, plaintiff had resigned from the position which he had had prior to World War II with United States Steel Export Company in South America and from which company he had had an extended leave of absence for naval service. His employment with Electric Boat Company was terminated for health reasons in early October 1946, effective December 1,1946.
25. On October 10, 1946, the plaintiff filed an application for disability compensation with the Veterans Administration. In this application he stated that he was employed by the Electric Boat Company, Groton, Connecticut, but noted that he had “not been up to par physically for some time. Am resigning from this position effective 1 December 1946.” Replying to a question on the application form as to the names and addresses of all civilian physicians who had treated him for any illness prior to, during, or since Ms (naval) service, the plaintiff stated “None — minor illness only prior to service. Self administration of treatment since leaving service.” He answered item No. 32 on the application as follows:

32. Nature of disease or injury on account of which claim is made and date each began.

1. Malaria — Benign Tertian and malignant tertian beginning Jan. 1943. See Naval Record. Also several attacks at home — periodic attacks.
2. Hernia — April 1943 — See Naval Record.
3. Headaches & nausea — May 1945 — See Naval Record.
4. General Physical Malaise — Recurrent [ajnemia — ■ lack of energy, etc.
26. On April 24, 1947, plaintiff was given a neuropsychi-atric examination by Dr. A. B. Musa, neuropsychiatrist, of *120 the Veterans Administration. The report of this examination stated, in pertinent part, as follows :
Psychiatric examination: He is a courteous, friendly, sociable and pleasant appearing, middle-aged man, graduate of Annapolis and Harvard Law School. He cooperated well with the examination and freely entered into various phases of the illnesses that he had acquired while in the naval service. He gave an accurate chronological record of his past life. He showed some anxiety, apprehension and worry about his health. While discussing various phases of his malaria contact in Guadalcanal he was inclined to grow rather tearful and showed tremors of the head. Frequently during the examination his head tremor was noticeable when he was placed under stress and strain of questioning about the detail of his life. He expressed contentment in his marital life and that he likes his present work very much. He was appreciative of all the things that have been done for him thus far in the VA. He spoke well of everyone with whom he had come in contact in connection with his examination. He stated that he was not interested in compensation but he was advised to file a claim for the purpose of future security in case he finds himself disabled as result of this present discomfort.
He said, “At times when I am tired I get pressure feeling over frontal head. This shaking of the head which I am conscious of. Occasionally at night I get attacks of shaking, especially with a tired feeling when I am pushed too hard physically. I have not the stamina that I used to have. Occasionally, especially in summertime, I get a mild attack of fever and chill. I caught malaria in Guadalcanal January 1943. At the last attack they told me I was out of my head, May 1943, because of high fever and malaria.”
Blood picture at this date reveals no malaria.
He is correctly oriented in all the spheres. He shows above average intelligence. No disorder found in his insight and judgment. He is making satisfactory social and industrial adjustment.
DIAGNOSIS: Anxiety neurosis.
On June 10, 1947, plaintiff was awarded 10 percent disability compensation for “nervous condition following recurrent malaria.”
27. On February 3, 1948, plaintiff was given a neuro-psychiatric examination by Hr. Bobert B. Levin of the Veter *121 ans Administration. The report of this examination reads as follows:
This 41-year-old married lawyer reports at the request of the Rating Board.
HistoRX : He was in good health prior to military service. He acquired malaria in Guadalcanal in 1942. While in Guadalcanal he apparently was run down from constant recurrent attacks of malaria. He lost 50 to 60 lbs. Subsequent to this he was in the hospital for a total of about 18 months for his malaria ana weakness. It was difficult to treat his malaria because he always vomited during the acute attacks. In May 1945 he [be] came very ül after a few tablets of an experimental drug for his malaria. He was discharged from the Navy March 1946 by reason of demobilization.
Since discharge he has been in very good health. He has -been eating well and maintains his weight. Occasionally he gets frontal headaches, generally when he is overworking. His wife has noted that his head shakes at times when he is tired. He himself is not especially aware of this head shaking. He has been working steadily.
NeuRolooical ExamiNAhoN: He is neat, slightly tense and nervous. He is slightly over-talkative. He is well oriented and coherent. The cranial nerves are intact. The arm reflexes are equal and active. The abdominal and scrotal reflexes are equal and active. The knee jerks and ankle jerks are equal and active. Sensation and position sense are normal throughout. The Babinski is negative.
Diagnosis :
1. No disease of nervous system. (In 1945 on two occasions electro-encephalograms were reported as abnormal.)
2. Anxiety reaction, slight — manifested by frontal headaches and shaking of the head.
(In view of the 2 abnormal EEG in 1945, it was recommended that another EEG be done.)[2]
On April 18, 1948, plaintiff was advised that his claim for compensation benefits had been reconsidered, based upon the report of his examination of February 8, 1948, and that it had been held that no change was warranted in the previous 10 percent rating.
*122 28. Appended to the neuropsychiatrie examination, conducted by the Veterans Administration on February 3,1948, was an electroencephalographic report of the same date. The impression reported by the examining physician was :
Impression: This record shows an abnormal amount of slow activity during hyperventilation. It seems, however, that tlxis abnormality is somewhat related to disturbed sugar metabolism. This may be due either to a general somatic factor (liver insufficiency? adrenal insufficiency?), or to sequella of the previous encephalopathy. (Sugar metabolism and liver function tests should be performed.) It seems that the patient should remain under medical supervision. (Emphasis supplied.)
29. On August 31,1949, plaintiff addressed the following letter to the Veterans Administration:
Be: Claim No. 3895 880
With regard to monthly compensation payments which I am currently receiving in connection your finding of Service Connected Disability resulting from malaria (benign and malignant types) incurred while on duty in the South Pacific in World War II, I hereby request that you discontinue, effective upon receipt hereof, further payments.
So far as I am able to determine my condition has not become aggravated and I find that I am able to earn a livelihood. So long as this condition obtains, I shall make no further claim for compensation.
Thank you for the equitable consideration which I have received from you.
30. Subsequent to his release from active duty on March 29, 1946, plaintiff served on active duty for training during the following periods:
September 1, 1949 to September 14, 1949
June 11, 1951 to June 24, 1951
May 12, 1952 to May 25, 1952
June 12, 1955 to June 25, 1955
May 6, 1956 to May 19, 1956
November 4, 1956 to November 17, 1956
Plaintiff was found to be physically fit to perform the duties of his rank at the beginning of each period of active duty *123 for training, and to be physically qualified for release from active duty at the end of each period.
31. In his Officer’s Fitness Keport, dated September 20, 1949, for the period of annual training duty from September 1, 1949, to September 14, 1949, plaintiff indicated that he was physically qualified for sea duty. The reporting officer indicated that plaintiff was qualified to perform his present duties and had no mental or moral weakness which adversely affected his efficiency. The reporting officer appraised plaintiff’s performance of active duty, as follows:
Cde Merson’s thorough knowledge of the law and practical experience was a great help to this office while on his two weeks’ active duty. He has a pleasing personality. He is energetic and diligent in his work. He possesses good common sense and judgment. He has no mental foibles. Cdr Merson has a healthy attitude toward the Naval service. He is recommended for promotion.
32. Following his employment at the Electric Boat Company, the plaintiff was employed from 1947 to 1952 as head of the legal department of the Dixie Cup Company. During this period, the plaintiff became quite active in civic affairs. From early 1953 until about August 1953, the plaintiff was employed by a division of the State Department in Washington. From October 1953 until about May 1954, he was employed by Temple University as vice president in charge of development. In January 1955, the plaintiff began the practice of law in Philadelphia, continuing in such practice until September 1957.
33. On May 14, 1957, the plaintiff submitted a further application to the Veterans Administration for disability compensation. Although he answered “none” to the question as to a listing of civilian physicians who had treated him for any sickness, disease, or injury prior to, during, or since his (naval) service, he gave a detailed reply to the question as to the nature of the disease or illness for which claim was made. It reads as follows:
ORGANIC Impairment op Central Nervous System Resulting From Cerebral Malaria Contracted While Serving as Executive Oeficer, U.S. Naval Base, Gua- *124 DALOANAL, BRITISH SOLOMON ISLANDS. TREMORS, NOW Steadily Worsening, First Manifested Themselves Soon Aeter Several Severe Attacks op Malaria in 1943 Following Evacuation From Guadalcanal by Army Hospital Plane.
Under item 51, “Remarks,” the plaintiff answered as follows:
Monthly Compensation Payments Received Under Claim # C 3895 880 Were Discontinued Aug. 1949 in Accordance With My Own Request. See My Letter Aug. 31,1949, and Y.A. Reply op Sept. 8,1949. Reinstatement Is Applied por To-day Because My Ability To Earn a Livelihood Is Substantially Impaired. I Therepore Request an Appropriate Increase in Percentage op Disability.
34. On October 3, 1957, the plaintiff was the subject of a neurological and neuropsychiatric examination by a Veterans Administration physician at the Philadelphia facility of that office. In submitting to this examination, the plaintiff listed substantially continuous employment from May 1946 until August 1957. He also stated the symptoms of his present complaint to be “Impairment of nervous system[.] Head tremor, Sleeplessness, etc.” The text of the report reads as follows:
Reference is made to the case folder for past records and history.
Veteran states that when he came home from service on a convalescent leave his wife had noticed that he was nervous but did not say anything to him. He describes how during that time his little child of whom he was very fond did something minor which did not please him. He picked this little girl up and almost threw it [sic] to the ground because of excess uncalled for anger. He emphatically states that this was not like him and that this had made his wife think that his nerves were not good any more. He states that after he was discharged from service his wife also noted that he was tense, noticed that he had a tremor of the head but she would not say anything to him because she did not want to make him feel badly. He says that he did not pay any attention to the tremor, no one had said anything to him and one of the Officials at Temple University where he was formerly a Vice President had made *125 some remark that he is suffering from Parkinsonism. However, he tries to indicate that all his associates never told him about the tremor and his wife never told him about it because she did not want to worry him. He states that he was always tense since discharge from service, did not feel well but he kept on going because he was able to manage. As a matter of fact he had rather important jobs as is noted on VA Form 2545 in paragraph 14a. He states that he did not try to press a claim for compensation of any degree because he was able to work despite the fact that his symptoms became gradually worse. However, in May 1957 the symptoms reached such' peak as that he was not able to do any work whatsoever and has not even gone into his Law Office to do anything. Therefore since May 1957 this veteran, who had been practicing as an attorney in Philadelphia since January 1955, has done no work whatsoever. He states that he has the will, the drive and the force to work but he is not feeling well, and therefore cannot do anything.
He describes himself as being extremely nervous and by this he means he is high strung, tense, is easily excited, is irritable, has a tremor of the voice, tremor of the head, his writing is tremulous and suffers from insomnia. He states that he has headaches but not any more than any other individual.
This veteran is of fair development and nourishment, neatly dressed, is extremely polite, courteous and attentive. He g[a]ve me the impression of being a very intelligent individual and seems to be sincere. The tremor of his voice is obvious but at times this disappears. As far as the head and handwriting is concerned this will be discussed in the neurological examination. Affect is normal, mood is one of depression and tension. During the interview this tension seems to vary in intensity but his preoccupation and depression is quite obvious all the time. Sensorium is clear, general judgment is good.
Neurological Examination: Positive Findings — Veteran keeps his head to the left something that he never did before. However he is able to straighten up his head, rotate his head from side to side in an equal force. There is a side to side tremor of the head at times nodding but this also varies in intensity during the interview. It seems that when we tried to have him do something the tremors increased. His handwriting is rather sprawling in nature, though he may have had poor penmanship all the time. However, judging from the case folder his handwriting has become more [illegible] and *126 there is an indication of tension. He holds the pen tightly in order to write. Fingers of the extended hands are tremulous. At rest the hand is tremulous but by no means present all the time. He is normally right handed but yet the grip of the left hand is a great deal stronger than the right, however, it should [be] mentioned that the grip of the right hand is not weak by any means. However, in comparison this may be of significance. Otherwise there were no pathological findings, there was no obvious disassociation of movements, no cogwheel rigidity, facial expression was not vaceous [sic], etc. The most important obvious feature was the tremor of the head.
Industrial Adjustment Keference is made to paragraph 14a on VA Form 2546 which was completed by 5xe veteran. He has had important jobs in the past. From October 1953 to December 1954 he was Vice President of Temple University and his job was to build up the Undergraduate School. However, because of some disagreement in the administrative personnel he decided to quit and went into Law Practice in January 1955. Since May 1957 veteran has not gone into his office because of the way he feels.
Social Adjustment Veteran has always had an active social life because of the type of work he has done. H[is] wife died only two days ago. He tells me definitely that she went hito the hospital two weeks ago and before then did not complain because she was the type who did not like to go to doctors. Pie now has 2 children. Since May 1957 his social life has been/null because of his nervous condition.
Comment This veteran had malignant tertian malaria in service. On May 18, 1945 he was given an experimental drug for malaria which he acquired in Guadalcanal from 1942 to 1942 [sic] and after completing 2/3rds of the dosage he developed a headache which persisted for 6 weeks. All laboratory tests were negative except EEG which showed moderate abnormal changes which could not be interpreted. At one time the possibility of Cerebral Malaria had been considered. However the diagnosis was changed to “Asthenia Post-Infective”. It is also interesting to note that there is a “special examination and treatment sheet from the Navy dated June 15, 1945 in which it states 6-16-45; Facial Tremors cooperative, generalized abnormal EEG”. Why he should have had facial tremors at that time is not explained. Today he has tremors of the head. Whether there is a relationship of the head *127 tremors today to the facial tremors described above one cannot state because the records are not too complete. Has handwriting is somewhat tremulous and he has to hold the pencil very tightly. There may be a possibility that he has Parkinsonism without the rigidity but at this time I do not feel that this diagnosis is justified, though it certainly should be kept in mind. It is also important to realize that on two occasions he had abnormal EEG’s in service, though later the EEG was normal. He refuses to go to a hospital for observation at this time because of the recent death of his wife. There is no doubt that this veteran is badly in need of treatment and he has completed a form out today to receive treatment at the Mental Hygiene Clinic.
Diagnosis Anxiety Reaction, moderately severe to severe, associated with depressive features and tremors of the head and hand. (See Comment)
(S) I. Kotzin, M.D.
I. KoxziN, M.D.,

Neuropsychiatrist, Medical Division.

35. Plaintiff was awarded disability compensation for a service-connected nervous condition, rated at 10 percent from March 30, 1946, to October 2, 1957, and rerated at 50 percent beginning October 3, 1957.
36. Prior to January 7, 1958, plaintiff filed an application for correction of his naval record with the appropriate Naval Board, requesting that his record be corrected to show that he had been separated from the service by reason of physical disability and had been placed on the disability retired list. In support of the request he stated that he relied upon his entire naval record, his entire naval health record, his Veterans Administration file, a statement, in affidavit form, by Daniel S. Feldman, M.D., dated October 30, 1957, and a statement, in affidavit form, by William M. Hitzig, M.D., dated November 9, 1957.
In his application for correction of record, plaintiff requested an opportunity to appear, at no expense to the Government, before the Board.
37. In the neurological evaluation report of Daniel S. Feldman, M.D., dated October 30, 1957, and addressed to William M. Hitzig, M.D., which was appended together with Dr. Feldman’s sworn affidavit to plaintiff’s application to the *128 Board for Correction of Naval Records, Dr. Feldman indicated that plaintiff had been hospitalized July 16-18, 1957, at The Mount Sinai Hospital, New York City, New York, for the purpose of a complete physical and neurological evaluation. Dr. Feldman stated that he had seen and had examined the plaintiff there, and that plaintiff had made available to him photostats of his entire health records during his period of active naval service.
In his report, Dr. Feldman reviewed plaintiff’s medical history. Dr. Feldman reported that plaintiff stated “that although he did not feel that he was completely well, as 'his improvement during his convalescent hospitalization did not continue to occur, he requested administrative action which would return him to some sort of useful activity in the Navy during the war.” Dr. Feldman’s report continued: “In January, 1944, he was noted to be qualified only for limited duty at the time of an annual physical; no reason is given. In June 1945, he was hospitalized at USNH Bethesda with complaints of headache. No Neurological abnormalities were reported. However, an electroencephalogram report notes facial tremors to be present on June 16, 1945, and the report shows diffuse abnormality to be present. A subsequent EEG dated July 8, 1945, is again abnormal, although less so. A Rorschach test diming his hospitalization was likewise suggestive of organic cerebral dysfunction.”
Dr. Feldman reported that plaintiff’s complaints at that time were those of generalized tremors, change in voice, appearance 'and alteration in handwriting, and personality Changes which occurred following the acute illness in 1948.
Dr. Feldman also reported that the neurological examination showed no specific abnormality of the mental status; that the face was somewhat fixed and expressionless, that blinking was infrequent, that there was a moderate tremor of the lips and tongue and that plaintiff’s voice was tremulous; that a side-to-side tremor of the head was noted; that the associated arm swing was markedly reduced, that plaintiff’s attitude was stoop-shouldered, and that an intermittent alternating tremor of the hand was present; that a mild increase in tone was diffusely pi’esent and that his handwriting *129 was small and irregular; that amplitude of rapid alternating movements was decreased; that Myerson’s sign was present; and than an electroencephalogram was reported as a normal record.
Dr. Feldman further stated:
The present picture is that of an extrapyramidal syndrome of the Parkinsonian type, in a young man (for this disorder) with no family background of such disorder. This disease process appears to be post-encephalitic. The patient gives a clear-cut history of a febrile illness with a severe disturbance of consciousness, followed by a prolonged period of memory disturbance, and upon recovery asthenia and personality change, abnormal EEG’s, and then the development early in life of extrapyramidal disease. The nature of the etiologic agent is not clear; the identification of the malarial parasites is conflicting and in an area where malaria is endemic other diseases than malaria may be present in an infected individual. It is unfortunately many years since the acute episode so that diagnostic investigations are of somewhat limited value in establishing an exact etiology. The clinical picture is that, however, of acute encephalitis and post-encephalitic phenomena.
Dr. Feldman expressed the opinion that, for the reasons stated, plaintiff was not fit for duty at the time he was released to inactive service.
38. "William M. Hitzig, M.D., in his sworn statement dated November 9,1957, which was appended to plaintiff’s application for correction of military records, filed with the Board for Correction of Naval Kecords, stated that plaintiff was hospitalized by him at The Mount Sinai Hospital, New York, New York, from July 16 to July 18, 1957, for the purpose of a complete physical and neurological evaluation. Dr. Hitzig further reported that plaintiff’s general physical examination showed “moderate generalized asthenia but was otherwise not remarkable. His neurological examination showed him to be irritable and restless, to have a nodding tremor of the head and face, reduced to absent associated arm swing and a suggestion of increased rigidity of his extremities.” Dr. Hitzig stated that he had reviewed plaintiff’s entire health record. Reference was made to the onset, history, and the course of plaintiff’s medical condition. Dr. *130 Hitzig stated that it was “significant to note that several electroencephalograms [accomplished in 1945] were reported to be abnormal and that on one of them the report includes a comment that facial tremors were present.” It was stated that plaintiff was seen during his hospitalization by Dr. Feldman and Dr. Morton Nathanson, Associate Professor of Neurology, New York University, and Associate Attending Neurologist, The Mount Sinai Hospital, New York, New York.
Dr. Hitzig concluded his report by stating :
A careful personal evaluation of the facts in this case point out to me that Mr. Merson suffered an acute personality change with this illness in 1943; the major characteristic of the 1943 episode was the acute and severe disturbance of consciousness. Asthenia and personality change have continued to be present since the episode. He has developed at the age of approximately 47 an extrapyramidal syndrome. This Parkinsonian picture is of the type seen following encephalitis because of the patient’s age and previous history and lack of a family history of similar dysfunction.
Therefore, in consideration of all the facts in Mr-Merson’s case, it is my opinion that:
(1) Mr. Martin Merson was not fit for duty at the time he was released from active naval service in 1945 [sic].
(2) The disability that rendered him unfit for duty at that time was encephalitis, acute, with post encephalitic phenomena.
(3) The sequelae of the encephalitis have continued to be present and have produced increasing symptoms and disability.
(4) His present complaints are the result of an illness incurred in the line of duty, not due to his own misconduct.
(5) The defects and disabilities will not only continue to be present throughout the remainder of his life, but may be sufficiently progressive to cause eventually permanent and complete invalidism.
39. On May 9, 1958, the Chairman of the Board for Correction of Naval Records requested the comment and opinion of the Chief, Bureau of Medicine and Surgeiy, Navy Department, concerning the plaintiff’s physical condition at the time of his release, raising the question as to whether his *131 physical condition was such as to have warranted his retirement by reason of physical disability. Particular attention was invited to the medical statements submitted in support of his request for correction of record. There were enclosed, with the request, the Board’s file, the plaintiff’s medical file, his officer file, and his fitness report jacket.
40. The Assistant Chief for Personnel and Professional Operations of the Bureau of Medicine and Surgery replied for the Chief of the Bureau to the inquiry referred to in the preceding finding, as follows:
Department of the Navy
Bureau of Medicine and Surgery
Washington 25, D.C.
In Reply Refer to
BUMED-3131-RSH: ek
Merson, Martin
62081
24 March 1959
From: Chief, Bureau of Medicine and Surgery
To: Chairman, Board for Correction of Naval Records
Subj: Merson, Martin, Cdr, USNR, 62081; advisory opinion in the case of
Ref: (a) BCNR ltr BE; vrw dtd 9 May 1958
Enel: (1) BCNR file on subject officer
(2) Medical Record of subject officer
(3) Officer File (2 parts)
(4) Fitness Report Jacket of subject officer
1. In accordance with the request contained in reference (a), the following advisory opinion is hereby submitted.
2. A careful review of enclosures (1) through (4) indicates that Cdr Merson was originally hospitalized 27 January 1943, U.S. Naval Base, Lunga, Southwest Pacific with the first of five successive attacks of Malaria, Malignant, Tertian. On 15 May 1943, he was transferred to the United States for further treatment and convalescence, suffering periodic attacks of Malaria to 20 December 1943. On 22 April 1944,_ he was found physically qualified for promotion to Lieutenant Commander but one month later was again hospitalized for persistent headaches that were diagnosed as Asthenia, Postinfective. Following an intensive mental and phys *132 ical rehabilitation program, Cde Merson was found physically fit for full duty status and on 1 January 1946, he was found physically qualified for promotion to Commander, TJSNR. One day later, 2 January 1946, petitioner was found physically fit for release to inactive duty.
3. Further, it is noted that Cde Merson has been found physically qualified to perform the duties of his rank for six, two-week periods of active duty, the last being in November 1956. Also, a review of his numerous accomplishments in the civilian business world indicate the pressure of a sustained, lengthy, and vigorous pursuit of his vocational interests.
4. Accordingly, it is the opinion of this Bureau that there is no evidence of record to suggest that Cde Mer-son’s physical condition at the time of his release from active duty, or subsequent thereto for several years, was anything but fully qualified.
(S)' E. C. Kenney
E. C. KeNNey,

Assistant Chief for Personnel and Professional Operations.

41. On March 27, 1959, the Executive Secretary of the Board for Correction of Naval Records wrote a letter to plaintiff’s counsel, enclosing a copy of the letter quoted in the preceding finding. Comments were invited from the plaintiff and his attorney on the advisory opinion of the Bureau of Medicine and Surgery. The request was made that counsel submit any further evidence he may have in support of the contention that the plaintiff was incapacitated in 1946 to such an extent that he should have been retired for physical disability.
42. On June 8, 1959, in accordance with the invitation of March 27,1959, of the Executive Secretary, Board for Correction of Naval Records, plaintiff, through counsel, filed a brief with affidavits incorporated therein to support the plaintiff’s request for relief and formal hearing at which appropriate evidence could be presented.
3h plaintiff’s brief filed with the Board for Correction of Naval Records, plaintiff reviewed the facts pertinent to his application for correction of military records. In his brief the plaintiff also cited the following matters: (1) His chronology of duty stations; (2) his pre-World War II in *133 active military service; (3) tire quality of bis performance of duty, and decorations and awards; (4) bis wartime service from May 25, 1942, to March 29, 1946; (5) his civilian record from 1930 through the then current period; (6) evidence of the quality of his performance in his civilian position; (7) a medical chronology, specifically including his health records from June 2,1924, to August 30, 1939; (8) plaintiff’s physical condition at the time of his being ordered to active duty on May 25, 1942; (9) the course of the disabling condition from January 27, 1943, to January 2, 1946, setting forth specific entries from plaintiff’s official medical records; (10) a summary of hospitalization and treatment during active duty due to his service-incurred disability; (11) matters other than health record entries relating to the course of his disease prior to release from active duty; (12) fitness and officer qualification reports which pertained to plaintiff’s physical condition; (13) plaintiff’s resignation, on November 8, 1945, from the United States Steel Export Company from a position involving work in Brazil in view of advice of naval medical officers; (14) plaintiff’s promotions in rank while on active duty; (15) the course of plaintiff’s condition subsequent to release from active duty and particularly the documentation and course reflected in the records of the Veterans Administration; (16) naval medical record entries during the post-World War II periods, with particular reference to the fact that he had served six 2-week tours of active duty and the physical examinations relative thereto; and (17) the entry contained in a Naval Reserve fitness report for the period December 8, 1954, to June 30, 1955, wherein it was stated, in pertinent part, that his military bearing and appearance were excellent but: “However, he seems to have a slight nervous habit of twitching his head to one side when speaking. * * *” (Emphasis supplied.)
This report was one of the fitness reports prepared subsequent to plaintiff’s relief from active duty in 1946 and was prepared by a line officer who was a layman.
In addition to the foregoing matters, plaintiff presented a medical disquisition which included, among other tilings, the citation of medical literature pertinent to malaria; the identification of the five types of malaria; a description of *134 the five types of malaria and their symptomatology, particularly cerebral malaria; and the classifications of pernicious or cerebral types of malignant tertian malaria.
Attached to plaintiff’s brief were the affidavits of (1) plaintiff’s brother, David Merson, which related, in pertinent part, to plaintiff’s physical condition before, during, upon release from, and subsequent to, plaintiff’s active duty during World War II, and (2) that of Cdr. FranlnBulHey, TJSNR, of Grosse Pointe, Michigan. Commander Bulkley, who had known plaintiff since early Guadalcanal days, having shared a tent with and having succeeded him as executive officer, in his affidavit stated, in part, as follows: “At that time [early 1943J, he was a strong, wiry type of man who worked countless hours at his job.” Of a visit at plaintiff’s home in 1950, Commander Bulkley stated: “The change in his appearance and physical condition was marked. His head and 'hands shook continually as though he had palsy.” Plaintiff also submitted as exhibits and cited the contents of the medical statements of William M. Hitzig, M.D., and Daniel S. Feldman, M.D.
Plaintiff cited certain Federal statutes governing his entitlement to retirement by reason of physical disability. In his statement of conclusions, plaintiff asserted that — •
(1) Plaintiff suffered disability while on active duty;
(2) The disability continued and his condition deteriorated ;
(3) The disability was present at time of release to inactive duty and was incapacitating; and
(4) Plaintiff was not fit for duty at the time he was released from active naval service.
With respect to the degree of fitness required for a finding of “fit for duty,” plaintiff cited the Synopsis of Opinions of the Judge Advocate General of the Navy of November 25, 1958, relating to physical disability retirement and separations under Title 10, U.S.C., Chapter 61, wherein it was stated, in pertinent part, as follows:
The general standard of fitness must be applied, in the case of an officer of the line, to all of the duties or hü-lets in which such officer might normally, in the course of assignment over a period of time, find himself serving.
*135 With, respect to disability proceedings, the standard long applied in the naval service is whether the individual is or is not physically" capable of performing ALL the duties of his rank, grade, or rating to a degree that would reasonably fulfill the purposes of his employment. (Emphasis supplied.)
Reference was also made to the fact that the standards would be the same whether applied to members of the Regular Navy and Marine Corps or to members of the Reserve components thereof on active duty; and plaintiff asserted that a recommendation that a party is fit for limited duty was incompatible with a finding that he was physically capable of performing all. the duties of his rank, grade, or rating to a degree that would reasonably fulfill the purposes of his employment.
Based on the matters cited from the plaintiff’s official naval records, the expert medical evidence submitted by plaintiff, the affidavits of individuals having personal knowledge of plaintiff’s state of health, the medical literature, and law applicable to his case, plaintiff asserted that his naval record should be corrected to show, his retirement by reason of physical disability in lieu of release from active duty hr the grade of commander.
43. On June 9, 1959, the Board for Correction of Naval Records again wrote to the Chief, Bureau of Medicine and Surgery, calling to his attention the brief submitted on behalf of the plaintiff, and requesting that “Petitioner’s case be reviewed and your comment and recommendation be forwarded to the Board.”
44. On July 6, 1959, the Director, Professional Division, Bureau of Medicine and Surgery, transmitted the Bureau’s second advisory opinion to the Board for Correction of Naval Records. In this advisory opinion, the opinion was expressed that the brief filed by plaintiff did not present any additional evidence to support the original petition. However, it was also stated:
* * * * *
4. * * * Navy medical records show very clearly that CnR Merson contracted a severe case of malaria, while serving on Guadalcanal in 1943. Moreover, the récords of evidence also indicate that at the present time peti *136 tioner is incapacitated, by the progressively destructive processes of an extrapyramvtdal disease, secondary to an acute encephalitis incurred in 1943; hence a service-incurred physical disability. (Emphasis supplied.)
5. However, this is not sufficient cause for consideration of disability retirement benefits or severance pay as provided by the laws administered by the Navy Department. As the enclosures reveal, such service incurred disability may afford eligibility for compensation under laws administered by the Veterans Administration. The crucial factor in making a determination as to which laws are applicable is found in the determination of physical fitness for duty at the time of release from active duty. Here, enclosure (5) [plaintiff’s brief] deviates from its factual presentation of evidence and presents only an opinion as to Cdr Merson’s physical fitness for active duty as of 2 January 1946, the date he was released to inactive duty. On pages 103 and 104, enclosure (5), petitioner attempts to discount the Navy findings of “fit for full duty” on 16 November 1945, and “found physically qualified for temporary promotion to Commander, USNR,” on 1 January 1946, by minimizing the professional stature of the U.S. Naval Special Hospital, Asheville, North Carolina. Some philosophy regarding the impending end of the war and the need to unload all patients is not considered ample evidence that a board of fully qualified Navy physicians erred in finding subject petitioner fit for duty. Further, the reviewing board of equally well qualified physicians in this Bureau concurred in these findings, and the subsequent sis tours of two-weeks training duty presents ample medical testimony that Cdr Merson was in fact, fully qualified physically to perform all of the duties of his rank at the time he was released from active duty, and for some time thereafter.
6. In view of the above, it is the continued advisory opinion of this Bureau that subject petition has no medical merit and that Cdr Merson is not entitled to disability retirement or severance pay.
45. On July 30,1959, the Executive Secretary of the Board for Correction of Naval Records sent a letter to the plaintiff, with a copy to his attorney, reading as follows:
Reference is made to your application for correction of your naval record, under the provisions of Title 10 U.S.C. 1552.
*137 Administrative regulations and procedures established by the Secretary of the Navy for the guidance of this Board provide that the burden of proof is on a Petitioner to show by documentary evidence that an error has been made, or an injustice has been suffered. Further, a hearing by the Board may be denied when a Petitioner has failed to show that an entry or omission in his naval record was improper or unjust under then existing standards of naval law, administration, and practice.
Preliminary examination of your naval record and review of the material submitted by you fails to establish a sufficient basis for further action by this Board. In this connection, you are informed that your detailed brief was reviewed by the Board together with all other documentary evidence of record.
Although your physical condition today may be of such disabling degree as to warrant retirement for physical condition if you were on extended active duty now, your condition at the time of your release from active duty in 1946 is of primary consideration. Records show that you served on six tours of two-weeks’ training duty subsequent to 1946 with no indication that your admittedly service-connected disabilities rendered you unfit.
It is not the intention of the Board to imply that a subsequent review of your case may not be had. As stated above, however, the burden is on you to show that an error or injustice has occurred.
In the absence of additional material evidence no further action on your application is contemplated.
46. On August 14,1959, the Assistant Executive Secretary of the Board for Correction of Naval Records wrote to plaintiff’s counsel advising, in response to a request for a copy of the proceedings, that there “are no proceedings in the case since the Board, by unanimous vote, denied the request for a hearing.”
47. No further material was submitted to the Board for Correction of Naval Records by or on behalf of the plaintiff.
48. Plaintiff was, for the first time, found not to be physically qualified for active duty and retention in the USNR in his quadrennial examination, dated February 24, 1959.
49. On February 1, 1960, the Veterans Administration’s rating sheet showed that plaintiff had been rated 60 percent *138 disabled from December 17,1959, for Parkinsonism; 50 percent disabled from October 3, 1957, to December 16, 1959, and 30 percent disabled from December 17, 1959, for anxiety reaction; and zero percent for hernia inguinal left and malaria.
50. Plaintiff has been authorized disability compensation at the rate of $159 per month for the period December 17, 1959, to March 20, 1962; at the rate of $151 per month for the period March 21, 1962, to June 25, 1963; and at the rate of $140 per month from June 26, 1963, to date.
51. Two expert witnesses for the defendant, Dr. William Alexander Rack (Lt. USN), Head of the Neurology Department, U.S. Naval Hospital, Bethesda, and Dr. Francis Gordon Soule, Jr. (Capt. USN), Chief of Medical Services at the U.S. Naval Hospital, Bethesda, each having very high professional qualifications, testified separately that, in their opinion, based upon their review of plaintiff’s medical records prior to his release from active duty, plaintiff was physically qualified for full duty at the time of his release from active duty.
52. Three physicians with the highest professional qualifications and standing testified on behalf of the plaintiff: Dr. Harold Stevens, Head of the Department of Neurology, George Washington University School of Medicine, also engaged in electroencephalography in several Washington hospitals; Dr. Daniel S. Feldman, a neurologist, Director of Division of Neurology of Maimonides Hospital, Brooklyn, New York, and Assistant Professor of Neurology in the State University of New York; and Dr. William M. Hitzig, a specialist in internal medicine. All three of the above physicians were engaged in private practice of medicine in New York City. Each of the above physicians testified that they had examined the plaintiff (none earlier than 11 years after his release to inactive duty) and had reviewed the plaintiff’s naval medical records up to the time of his release to inactive duty. Each doctor testified that the plaintiff was not fit for duty at the time of his release on the basis of the contents of the naval medical records. They were unanimous in stating that each of the Navy doctors, who had found the plain *139 tiff “fit for duty” both in 1946 and thereafter (in connection with plaintiff’s temporary duty), had made a mistake.
CONCLUSION OK LAW
On the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and his petition is dismissed. •
Order, April 15, 1966
This case comes before the court on plaintiff’s motion for rehearing, new trial and suspension of proceedings filed March 1, 1966 [in connection with the court’s opinion of October 15, 1965, and the dismissal of plaintiff’s petition pursuant thereto]. Upon consideration thereof, together with the opposition' thereto, and without oral argument, the case is remanded to the trial commissioner with directions to take further and additional evidence on the basis of the materials submitted by the plaintiff in the appendix to his said motion. Thereupon, the trial commissioner is directed to make new findings based on all the evidence bearing upon plaintiff’s condition at the time of his release to inactive duty as physically fit on March 29, 1946, and not limited to evidence relating directly to plaintiff’s physical condition prior to or at the time of said release.

 Electroencephalogram.

 This statement was handwritten on the report.